Johnny Joe MARTINEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 71818.

Court of Criminal Appeals of Texas, En Banc.

May 22, 1996.

Rehearing Denied June 26, 1996.

Grant Jones, Corpus Christi, for appellant.

James D. Rosenkild, Asst. Dist. Atty., Corpus Christi, Robert A. Huttash, State's Atty., Austin, for the State.

## OPINION

MEYERS, Judge.

Appellant, Johnny Joe Martinez, was convicted of capital murder in January, 1994.[1] TEX.PENAL CODE ANN. § 19.03(a)(2). During the punishment phase, the jury affirmatively answered the special issue set forth in Texas Code of Criminal Procedure art. 37.071 § 2(b) and negatively answered the special issue set forth in Article 37.071 § 2(e). The trial judge sentenced appellant to death as required by Texas Code of Criminal Procedure art. 37.071 § 2(g). Direct appeal is automatic. TEX.CODE CRIM.PROC.ANN. art. 37.071 § 2(h). We will affirm.

Appellant raises six points of error. He does not challenge the sufficiency of the evidence to support the jury's verdict· finding him guilty of capital murder. However, he does contend the evidence is insufficient to support the jury's affirmative answer to the special issue on future dangerousness. We will address the points as they are presented to us.

1. The crime was committed in July, 1993.

Looking at the evidence in the light most favorable to the jury's verdict, the record reveals the following facts. Appellant took the stand on his own behalf at the guilt/innocence phase of trial. According to appellant, he and a friend left Kingsville around 5:15 p.m. on July 14, 1993, and headed toward Corpus Christi. They stopped on the way out of town to buy a 12–pack of beer and began drinking it. After they arrived in Corpus, and over the course of the evening, the pair stopped at a number of nightclubs and allegedly consumed multiple alcoholic drinks.[2] They were soon joined by a third person. The trio was headed to yet another club when they met a man named Ernest Wortmann and engaged him in conversation. Wortmann decided to join the trio at the next nightclub. However, Wortmann was having car trouble, so appellant rode with him in case his car broke down along the way. By the time the group closed down the last bar, appellant had allegedly consumed twelve to thirteen alcoholic drinks.

According to appellant, the group then decided to go to a park on North Beach. Appellant again rode with Wortmann and the two stopped at a 7–11 convenience store where the deceased was working the early morning shift of July 15, 1993. Upon arriving at the 7–11, Wortmann entered the store and asked to use the telephone. Wortmann then apparently went back outside and told appellant that the car needed to cool down. Appellant suggested that the two go to the beach, but entered the store first to use the restroom. Before leaving the store, appellant and Wortmann are seen on the security videotape shoplifting several items. Back outside, appellant and Wortmann engaged in conversation and Wortmann allegedly told appellant that he was recently out of prison for robbing stores. Appellant jokingly suggested that he rob the 7–11. While standing by the car, the two discussed how easy it would be to rob the store, so appellant decided to rob it. Appellant testified that, while he normally did not carry a knife, he had a small knife with him that evening. He stated that he entered the store with the intent to

2. Appellant testified that he had not eaten anything prior to the trip and that he did not eat any food at the nightclubs.

steal money, but only intended to use the knife to scare the clerk.

The videotape then depicted appellant re-entering the store. Appellant is shown apparently asking the deceased for something and when the deceased partially turned away, appellant grabbed him around the neck and put the knife to his throat. Appellant then forced the deceased around the counter and into the cash register area. The video revealed that appellant had one arm in a choke hold around the deceased's neck and his other hand pressing the knife into the deceased's throat. The deceased opened the cash register and appellant took the money. Appellant then stabbed the deceased approximately two or three times before the deceased fell facedown and motionless on the floor. Appellant then thrust the knife into the deceased's back several more times before exiting the store.

When asked why he stabbed the deceased, appellant answered, "I don't know. That's a question I will never be able to answer." He said that he did not intend to kill the deceased. In fact, he told the jury that he did not even remember stabbing the deceased as many times as he did.[3]

Appellant further told the jury that he got scared after the stabbing and just started running. He stated that he ran to the beach, got down on his hands and knees, and started crying. He testified that he was not sure what he did with the knife, but that he turned himself in shortly thereafter. Appellant also admitted to the jury that he had lied about several remarks he made in his statements to police.[4]

A short while after the stabbing, Police Officer Kureska was dispatched to the Sandy Shores Hotel in reference to an individual who called the police saying he was involved in the convenience store crime. Upon arriving at the hotel, the officer entered the lobby and observed appellant·sitting on a couch in the presence of two security guards. Kureska testified at trial that appellant was very calm and quiet and seemed somewhat withdrawn. Kureska said appellant was cooperative and did not appear to be under the influence of alcohol. A hotel employee and one of the security guards also confirmed that appellant did not appear to have the smell of alcohol on his breath. The hotel employee further noted that appellant's clothes did not appear sandy or wet. During the trip to the police station, appellant asked Officer Ilse, "Is the guy I stabbed dead?"

At the police station appellant was taken to a room where he came into contact with Sergeant R.L. Garcia. Garcia stated that appellant was angry and told the officer that he had stabbed a man and wanted to talk to the officer "now." Garcia noted that this was said in an insistent and demanding tone. However, during the actual interview, appellant was cooperative and understanding. Appellant even attempted to help officers locate the knife he had used to stab the store clerk. Garcia noted that appellant did smell of alcohol, but he did not believe appellant was intoxicated.

At the punishment stage of trial, the State presented no additional evidence. Appellant, on the other hand, called long time friend, Verna Rodriguez, to testify to appellant's non-violent character. However, Rodriguez also told the jury that appellant grew up in a violent neighborhood and frequently got in disputes with people in which he would argue verbally. According to appellant's younger brother, David Martinez, appellant dropped out of school in the 10th grade[5] and joined a

---

3. According to testimony from the medical examiner, the deceased received two stab wounds to the neck, both of which were fatal. Each wound pierced an artery causing the deceased to lose a great deal of blood in a very short period of time. Plus, one wound to the top of the shoulder appeared somewhat irregular in that it could have been caused by a twisting of the knife or by more than one blow to the same area. Defensive cuts and scratches were apparent on the deceased's hands. Before the deceased died, he was able to call for an ambulance.

4. Appellant is shown to have given conflicting statements at different times as to the exact course of events after he exited the store. In one, Wortmann was driving slowly in order for him to jump into the car, while in another, Wortmann had taken off and appellant went running after him.

5. Appellant testified that he was not having problems in school, he just preferred to skip school and go down to Corpus Christi, so he eventually dropped out.

job training program, but appellant never finished the program. Martinez also recalled that his brother was involved in a school fight. Finally, the county jail coordinator testified that the jail did not have any "significant" problems with appellant. The coordinator stated that appellant's jail record included three minor write-ups including a "disagreement" with a guard.

■ In his first point of error, appellant contends that the evidence was insufficient to support the jury's affirmative answer to the special issue on future dangerousness. In reviewing the sufficiency of the evidence at the punishment, it is well-settled that we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have made the finding of future dangerousness beyond a reasonable doubt. *Barnes v. State*, 876 S.W.2d 316, 322 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).[6] The circumstances of the offense alone may be sufficient to sustain the jury's affirmative answer to the issue on future dangerousness. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). It may be helpful in the instant case to examine those cases in which we have found the evidence insufficient. However, we note that each case must be resolved on its own facts. *Id.*

In *Keeton v. State*, 724 S.W.2d 58 (Tex. Crim.App.1987), the defendant entered a grocery store and, without warning, shot a clerk and fired at the store owner. He then went behind the counter and stole both of the victims' purses. In *Roney v. State*, 632 S.W.2d 598 (Tex.Crim.App.1982), the defendant, without provocation, shot a grocery store clerk during a robbery, but after he had received the money. Another clerk testified at trial that the victim had his hands raised when he was shot. In *Beltran v. State*, 728 S.W.2d 382 (Tex.Crim.App.1987), during a robbery of a tortilleria, the defendant shot the victim immediately after she handed him the money from the cash drawer. In each of these instances, we acknowledged that the killings were senseless and unnecessary. However, we nevertheless held the circumstances of the offenses were not so brutal as to prove in and of themselves that any of the three defendants posed a continuing threat to society. *See Dinkins, supra.*

The circumstances in the instant case are distinguishable from these cases. In each of the above cases, the defendant utilized a gun to commit murder—an instrument which can potentially be used from across a room or at a very close range and which often results in death resulting from a single shot, even if not well-aimed. *See Warren v. State*, 562 S.W.2d 474 (Tex.Crim.App.1978) (defendant entered home unarmed, but when owner unexpectedly came home, found defendant, and pulled a gun, defendant "just shut his eyes and shot."). In the present case, on the other hand, appellant's weapon of choice was a knife—a weapon which, by virtue of its very nature, forces the user to be in such close proximity to his victim that he is often touching him or comes into contact with him on each blow. Furthermore, the character of the weapon is such that several thrusts are often utilized in order to ensure death—each additional thrust potentially indicating to any rational juror that such a personal act requires a wanton and callous disregard for human life. *Cf. Dinkins, supra* (evidence of future dangerousness found sufficient where one victim was shot twice at extremely close

---

6. The jury is permitted to look at several factors in its review of future dangerousness including, but not limited to:

  1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

  2. the calculated nature of the defendant's acts;

  3. the forethought and deliberateness exhibited by the crime's execution;

  4. the existence of a prior criminal record, and the severity of the prior crimes;

  5. the defendant's age and personal circumstances at the time of the offense;

  6. whether the defendant was acting under duress or the domination of another at the time of the offense;

  7. psychiatric evidence; and

  8. character evidence.

*Barnes, supra.; Keeton, supra.* These factors are also helpful in this Court's evaluation of the sufficiency of the evidence of future dangerousness.

range and she was either kneeling or sitting). Also present in the instant case, which was not present in the aforementioned cases, is the fact that the deceased here was lying facedown on the floor when most of the knife wounds were inflicted. A rational jury could perceive this as showing a wanton and callous disregard for human life.

A different conclusion could be drawn herein by comparing our holding in *(Sammie) Smith v. State,* 779 S.W.2d 417 (Tex. Crim.App.1989). In this case, the defendant committed murder in the course of a sexual assault. The evidence in the case showed that the defendant had been spraying several apartments for insects. At one point in time, he confided to a yardman the hope "that while he was there spraying the apartments ... that one of these girls live in, that maybe he would get lucky and one of them would want to lay him when he went inside the apartment to spray." *Id.* at 420. After gaining entry to the deceased's apartment, the defendant tied the deceased to the headboard of her bed and sexually assaulted her. *Id.* at 419. He then untied her and stabbed her fourteen times in the chest and back. In a written confession, the defendant explained: "After I raped her, I decided to kill her and kind of went crazy for a few minutes." *Id.* A forensic pathologist presented testimony attempting to account for this latter behavior. He explained to the jury that when a person is stabbed, he starts bleeding internally. This then causes less blood or oxygen-poor blood to go to the heart resulting in heart failure and other physical manifestations like the person making odd noises and foaming at the mouth. A defendant might then engage in a behavior of "over-kill[ing]" as an attempt to make the victim's body stop reacting in this manner.

We noted in *Smith* that the defendant's "hot-blooded nature" and the fact that he was looking for someone to have sex with, coupled with the presumption that the defendant did eventually commit the offense, supported an inference that the defendant was actually searching for potential "victims" on that day. However, we inexplicably held that the inferences that the jury might have drawn from this behavior and the defendant's comments were not sufficient to support the jury's affirmative answer to the issue on future dangerousness.

Notwithstanding the *Smith* decision, the series of events in the instant case is distinguishable. In the current scenario, evidence exists in the record that appellant and Wortmann went to two or three different 7–11's, ostensibly because they were supposed to reconnect with their friends, but were not sure quite where this was to happen. While this could have been interpreted as neutral behavior by the jury, a rational jury could also have inferred that they were looking for a place to commit a robbery. Furthermore, appellant admitted that he and Wortmann discussed how easy it would be to commit a robbery where they were—obviously a discussion of illegal activity. Then, with the admitted intention of using his knife to threaten or scare the clerk, appellant entered the store intent upon committing a robbery. Again, a rational jury could have concluded that this manifested an intent to use an admittedly potentially deadly weapon and could evidence a total disregard for the sanctity of human life.

Finally, while testimony was offered in *Smith* as to why the defendant might have stabbed his victim so many times, no such explanation was given in the present case except for appellant's simple statement that he did not know why he stabbed the deceased.

In addition to the above, the State also showed that, while appellant did not have an apparent adjudicated history of criminal behavior, he intentionally and habitually disobeyed the law with behavior such as his blatant (and apparently frequent) underage drinking and shoplifting. His actions in lying to the police about the actual events of the crime likewise show a complete disrespect for the law and authority.[7]

Given the brutal facts of the stabbing itself, including the fact that the majority of

7. Finally, while other evidence such as psychological testimony was not presented, the absence of this evidence does not automatically under

mine a jury's affirmative answer to the punishment issue on future dangerousness. *Dinkins,* 894 S.W.2d at 358 (and cases cited therein).

the knife thrusts were into the back of an already fallen victim; the conflicting testimony as to why appellant decided to commit a robbery; the number of lies that he told the police; and his apparent disregard for the law and authority; we conclude that a rational jury could have determined beyond a reasonable doubt that appellant would be a continuing threat to society. *Dinkins, supra.* Point of error one is overruled.

■ Appellant complains in his second and third points of error that the trial court erred in refusing to submit a charge to the jury that a person found guilty of capital murder and assessed a life sentence must serve thirty-five (35) calendar years before becoming eligible for parole. He alleges that this was in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Appellant relies primarily on *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), as his authority.

In *(Robert) Smith v. State,* 898 S.W.2d 838 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), similar issues were presented to this Court. Pursuant to the presentation of those issues, we engaged in a comprehensive discussion of *Simmons* as it relates to the law in Texas. We reiterated that parole is traditionally not a matter for jury consideration in a Texas capital murder trial, thus, it is not error for a trial court to refuse to admit testimony concerning parole. *See Jones v. State,* 843 S.W.2d 487, 495 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Further, we "absolutely reject[ed]" the premise that *Simmons* has been extended to parole eligible defendants. *Smith,* 898 S.W.2d at 848. As such, we hold that the requested instruction which is the subject of these points was appropriately refused by the trial court. *Smith, supra.* Appellant has given us no reason to revisit our analysis of *Smith* or provided us with any reason why *Smith* should not control in this case. *See Broxton v. State,* 909 S.W.2d 912

(Tex.Crim.App.1995). Points of error two and three are overruled.

In point of error four, appellant claims the trial court erred in refusing to grant his request to submit the mitigation special issue to the jury only in the event the jury answered special issue number one on future dangerousness in the affirmative. Appellant claims that this was a violation of "the Due Process Clause of the United States Constitution and the right to effective assistance of counsel as guaranteed by Article [sic] of the United States Constitution." Appellant cites no authority for his proposal. We hold this point to be multifarious and inadequately briefed, thus presenting nothing for review. Tex.R.App.Proc. 74(f). Point of error four is overruled.

■■ Appellant avers in point five that the trial court erred in refusing to define the word "militates" in the punishment charge. We disagree. Words which are not statutorily defined are to be given their usual meanings and no specific instructions are required. *Garcia v. State,* 887 S.W.2d 846, 859 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). "Militate" is such a word that can be given its ordinary meaning. Point of error five is overruled.

■ In related point six, appellant contends that the trial court erred in denying his request to substitute the word "militates" for the term "mitigates" in paragraph four of the punishment charge.[8] Appellant argues that the word, as it is statutorily used, communicates a message opposite to that intended. As appellant phrases it:

Use of the word "mitigates" with the phrase "against the imposition of the death penalty" creates a double negative and tells the jury to consider the evidence with a view toward softening their tendency *not* to give the death penalty rather than a

---

8. Paragraph four reads as follows:
    You shall consider all evidence submitted to you during the whole trial as to defendant's background or character or the circumstances of the offense *that militates for or mitigates against the imposition of the death penalty.* [Emphasis added.]

view toward lessening their desire to give the death penalty.

[Emphasis in original.]

Appellant concedes in his brief that the trial court's instruction essentially tracks the statutory language of Texas Code of Criminal Procedure article 37.071 § 2(d)(1). Following the law as it is set out by the Texas Legislature will not be deemed error on the part of a trial judge. *See Riddle v. State,* 888 S.W.2d 1, 8 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1701, 131 L.Ed.2d 563 (1995) (A jury charge which tracks the language of a particular statute is a proper charge on the statutory issue). Appellant's sixth point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

CLINTON, J., dissents.

BAIRD, Judge, concurring in part and dissenting in part.

I agree that no error at the guilt/innocence phase of trial was sufficient to warrant reversal of appellant's conviction. However, I disagree with the resolution of appellant's first point of error which relates to the punishment phase of his trial. Accordingly, I would affirm appellant's conviction, but reform his punishment from death to life imprisonment.

### I.

### A.

The "cruel and unusual" punishment clause of the Eighth Amendment prohibits death sentences assessed by juries whose discretion is not guided by legislatively defined standards. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Justice Douglas explained that punishment statutes which neither regulate nor guide the jury in the determination of punishment are unconstitutional.

... The high service rendered by the "cruel and unusual" punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.

\*     \*     \*     \*     \*     \*

... discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on "cruel and unusual" punishments.

*Id.,* 408 U.S. at 256–257, 92 S.Ct. at 2735 (Douglas, J., concurring).

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the United States Supreme Court reviewed the constitutionality of the Texas capital sentencing scheme enacted following *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In holding our scheme passed constitutional muster, the Supreme Court stated:

... By providing *prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.* Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution. *Furman v. Georgia,* 408 U.S., at 310, 92 S.Ct., at 2762 (Stewart, J., concurring).[1]

*Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958 (citing *Furman,* 408 U.S. at 310, 92 S.Ct. at 2762).

### B.

It is the responsibility of this Court to review a jury's verdict to ensure the death penalty was not arbitrarily or capriciously imposed.[2] In so doing,

---

1. All emphasis is supplied unless otherwise indicated.

    Every death penalty case is directly reviewed by this Court. *See,* Tex. Const. art. V, § 5; *and,* Tex.Code Crim.Proc.Ann. art. 4.04, § 2; art. 37.071, § 2, (h).

2. Arbitrary is defined as:

    Depending on individual discretion and *not fixed by law;* marked by or resulting from the unrestrained and often tyrannical exercise of power; *existing or coming about seemingly at*

... we must remember that "death is a punishment different from all other sanctions in kind rather than degree." *Woodson v. North Carolina*, 428 U.S. 280, 303–304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Because of the uniqueness of the death penalty, fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. *Id.*, 428 U.S. at 304, 96 S.Ct. at 2991. The constitutionality of our capital sentencing scheme depends upon the sentencer's ability to consider both the aggravating and the mitigating circumstances of a crime. *Penry v. Lynaugh*, 492 U.S. 302, 316, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256 (1989); *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); *Jurek v. Texas*, 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976).

*Wilkerson v. State*, 881 S.W.2d 321, 329 (Tex.Cr.App.1994). (Emphasis omitted.)

When reviewing the sufficiency of the evidence to sustain the death penalty, we employ the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); we determine if the evidence, when viewed in the light most favorable to the verdict, would persuade any rational trier of fact to answer the punishment issues in such a way as to impose the death penalty. *Joiner v. State*, 825 S.W.2d

701, 703 (Tex.Cr.App.1992). If the evidence is insufficient to persuade a rational fact finder, the fact finder necessarily acted arbitrarily and capriciously.

Generally, challenges to the sufficiency of the evidence to support the death penalty are couched in challenges to the punishment issue asking whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[3] In *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987), we adopted a non-exclusive list of factors to consider when the defendant challenges the sufficiency of the evidence to support an affirmative answer to the "future dangerousness" punishment issue.

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and,

8. character evidence.

---

random or by chance or as a capricious and unreasonable act of will.

Merriam–Webster Dictionary 59 (10th ed. 1993). Capricious is defined as:

A sudden, impulsive, and seemingly unmotivated notion or action; *a sudden unpredictable condition change a disposition to do things impulsively.*

Webster, at 169.

3. Tex.Code Crim.Proc.Ann. art. 37.071, § 2 provides:

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) *whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;* and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to

find the defendant guilty as a party under [Tex.Penal Code Ann. §§ 7.01 and 7.02], whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

If the jury returns an affirmative finding to each issue submitted under subsection (b) it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*Keeton,* 724 S.W.2d at 61; *Dinkins v. State,* 894 S.W.2d 330, 358 (Tex.Cr.App.1995); *and, Vuong v. State,* 830 S.W.2d 929, 934–935 (Tex.Cr.App.1992). While the absence of certain aggravating factors might not render the evidence insufficient to support an affirmative answer to the "future dangerousness" punishment issue, the overwhelming presence of mitigating evidence may. *Barley v. State,* 906 S.W.2d 27, 38 (Tex.Cr.App.1995) (Baird, Overstreet and Maloney, JJ., concurring) (citing *Wilkerson v. State,* 881 S.W.2d 321, 336 (Baird, J., dissenting)). In other words, our review of the factors which are present in the case under review and their mitigating/aggravating value determines whether the jury acted arbitrarily or capriciously.

## II.

The majority holds five of the *Keeton* factors support a rational finding of "future dangerousness." *Ante,* 924 S.W.2d at 697. First, the majority holds a rational jury could have inferred appellant was reconnoitering the convenience store looking for a place to commit a robbery. Second, appellant discussed committing the robbery with an accomplice. Third, appellant entered the convenience store to commit the robbery. Fourth, appellant failed to explain why the victim was repeatedly stabbed. Finally, the majority argues appellant habitually and blatantly disobeyed the law, and is, therefore, dangerous.

The majority's *Keeton* analysis is directly contradicted by our decisional authority. First, the majority argues a rational jury could have inferred the appellant was reconnoitering the convenience store to commit the crime. We have held such evidence insufficient to support a finding of future dangerousness. In *Smith v. State,* 779 S.W.2d 417, 421 (Tex.Cr.App.1989), we discussed the relevance of the defendant's "looking around" an area in anticipation of a crime and its effect on future dangerousness. *Id.*

> It is true that [defendant]'s hot-blooded nature, coupled with the presumption [defendant] did eventually commit the instant offense, supports an inference that on the day [defendant] returned to the residence he was *reconnoitering* for potential victims. We note, however, that in *Hawkins v. State,* 660 S.W.2d 65, 82 (Tex.Cr.App. 1983) there was *substantial other evidence of future dangerousness.*

*Smith,* 779 S.W.2d at 421. Therefore, the act of reconnoitering the store must be supported by "substantial other evidence of future dangerousness." *Ibid.*

Second, the majority finds appellant's discussion of the robbery with the accomplice, Ernest Wortmann, as indicative of future dangerousness. In *Smith,* the defendant, in a conversation with a bystander, discussed having sex with an apartment resident prior to the rape and murder. *Smith,* 779 S.W.2d at 421. We determined a rational jury needed more than just the discussion of a "hot-blooded" act to warrant a finding of future dangerousness. *Id.*

Third, the majority argues appellant's entering the store with the intention of committing robbery supports a finding of future dangerousness. However, the majority does not argue appellant entered the store to murder the victim. The uncontroverted testimony established that appellant's only intent was to rob the victim; upon entering the convenience store, appellant had no desire to harm the victim. As we stated in *Smith:*

> Moreover, whatever forethought may have gone into this offense evidently did not include murder, since [the defendant's] confession shows he only *decided to kill his victim after the rape was completed, and there are no contrary indicia in the record.*

*Smith,* 779 S.W.2d at 421 (citing *Huffman v. State,* 746 S.W.2d 212, 225 (Tex.Cr.App. 1988)).

Fourth, the majority argues appellant presented no evidence to explain the multiple stabbing of the victim. The majority argues the very circumstances of this offense are gruesome and indicative of a cold-blooded disregard for human life. In *Smith,* we stated:

> ... That a killing was senseless, unnecessary and cold-blooded *does not invariably justify affirmative answer to the second special issue.*

*Smith,* 779 S.W.2d at 421 (citing *Keeton,* 724 S.W.2d at 63–64).

In *Roney v. State,* 632 S.W.2d 598, 603 (Tex.Cr.App.1982), we held the purpose of the punishment stage in capital murder cases is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Ibid.*

> ... To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition.

*Ibid.* (Emphasis in original.) Though the instant murder was senseless, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a calculated and cold-blooded crime, which are vital to the imposition of the death penalty. *Jurek,* 428 U.S. at 262, 96 S.Ct. at 2950; *and, Roney,* 632 S.W.2d at 603; *O'Bryan v. State,* 591 S.W.2d 464, 480 (Tex.Cr.App.1979). Consequently, the majority's reliance upon this factor is misplaced.

Finally, the majority argues appellant habitually and blatantly disobeyed the law. However, the State introduced no evidence of any prior criminal convictions of appellant. The habitual and blatant violations the majority refers to are appellant's underage drinking and shoplifting; such misdemeanor offenses are not violent in nature nor do they constitute a trend toward violence on the part of appellant. *Barley,* 906 S.W.2d at 39 (Baird, Overstreet and Maloney, JJ., concurring) (Offenses listed at *ibid.,* n. 1, were not indicative that defendant would constitute a future danger to society.).

### III.

The majority's analysis fails to consider all the *Keeton* factors. Furthermore, those fac-

tors considered by the majority are contradicted by controlling precedent. Because the majority fails to conduct a proper *Keeton* analysis, I shall.

As noted earlier we must review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have affirmatively answered the "future dangerousness" punishment issue beyond a reasonable doubt. *Joiner,* 825 S.W.2d at 703. We must review each *Keeton* factor to ensure the sentence was not arbitrary or capricious.[4] To assist in determining whether the facts in the instant case were sufficient we may also look to other cases where the State failed to present sufficient evidence. *Keeton,* 724 S.W.2d at 61.

### A. Circumstances of the Offense, Calculated Acts and Forethought

The first, second and third *Keeton* factors require consideration of the circumstances of the capital offense, the calculated nature of the defendant's acts and the forethought and deliberateness exhibited in the crime's execution.

#### 1.

On July 15, 1993, appellant while drinking at several bars in Nueces County met Wortmann, who drove appellant to a convenience store. Appellant had nothing to eat that evening and had consumed in excess of thirteen alcoholic beverages. While at the store Wortmann discussed his need for money, his drug addiction and his prior criminal record for robbery. Both Wortmann and appellant discussed robbing the victim and how easy it could be. After this conversation appellant entered the store and committed the robbery.

The evidence shows that appellant possessed a small pocket knife with which he intended to scare the victim into surrendering the money. However, in the course of the robbery, the victim was stabbed eight times with appellant's knife; four non-fatal

---

**4.** In the interest of economy and organization I    have grouped several of the *Keeton* factors.

wounds were located in the back, and the fatal wounds were located in the neck which caused the victim to bleed to death.

Soon after the murder appellant telephoned the police to surrender. Hotel security testified appellant appeared "tired and drunk." On the way to the police station, appellant asked officers to pull over so he could vomit. The arresting officer described appellant as "very cooperative" and "concerned about what happened." Officers described appellant as "very upset" and "remorseful" as he confessed. Appellant further assisted police efforts to recover the murder weapon.

### 2.

The evidence does not indicate the crime was one calculated to cause the death of the victim. The uncontroverted evidence demonstrated appellant entered the store with the intent to rob the victim, not to kill him. When asked why he stabbed the victim appellant expressed remorse for the killing and stated: "I don't know. That's a question I will never be able to answer." Additionally, appellant voluntarily surrendered himself to authorities and attempted to aid them in finding the murder weapon; all of which militates against a finding of future dangerousness.

In *Smith*, 779 S.W.2d at 421, the defendant entered an apartment complex to spray the apartments with insecticide and in the course of doing so attacked, raped and repeatedly stabbed the victim in her apartment. The defendant confessed and admitted: "After I raped her I decided to kill her and kind of went crazy for a few minutes." The defendant was unable to explain why he brutally stabbed the victim to death. The defendant untied the victim from the bed where she had been raped and then proceeded to stab her fourteen times before fleeing the scene. We held multiple stabbings by themselves are inadequate to demonstrate future dangerousness. *Smith*, 779 S.W.2d at 419. We stated:

> ... the offense for which appellant was convicted was not shocking or otherwise extraordinary even with respect to the multiple stabbing. We cannot conclude the circumstances of the offense are *so*

heinous or evince an "aberration of character" so peculiarly "dangerous" as alone to justify an affirmative response to the second special issue.

*Ibid.* (Internal cites omitted.) We held such evidence insufficient to warrant the death penalty. *Ibid.*

In light of our holding in *Smith*, the first, second and third *Keeton* factors militate against a finding of future dangerousness.

### B. Prior Criminal, Psychiatric and Character Evidence

The fourth, seventh and eighth *Keeton* factors require consideration of appellant's prior criminal record and its severity, and any psychiatric or character evidence.

### 1.

Evidence presented at trial show appellant had no prior criminal convictions. Appellant's testimony at trial indicates his youthful drinking and shoplifting prior to the offense. The county jail coordinator testified appellant caused no significant problems at the jail, though he did have three minor infractions. The first infraction was for possession of a lighter in his cell, the second for being in an unauthorized location and the third for a disagreement with a guard.

During punishment the State re-offered all evidence from the guilt/innocence phase of the trial, and presented no further evidence. Neither the State nor appellant presented psychiatric evidence during the trial. Additionally, the State failed to introduce any character evidence during punishment, nor did the State introduce any character evidence dealing with violence during guilt/innocence. The appellant introduced character evidence of his non-violent nature. The State, during cross-examination, did elicit testimony of a physical confrontation appellant was involved in during high school. No other evidence was introduced regarding appellant's future dangerousness.

### 2.

Appellant had no prior criminal record nor do the infractions rise to the level of severity

to indicate a propensity for violence.[5] In *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr. App.1987), the State presented evidence that the defendant had a bad reputation as a law-abiding citizen, that he had a series of mostly non-violent prior offenses and that he was on probation at the time he committed the offense. *Id.*, 728 S.W.2d at 389. However, neither the State nor the defendant offered psychiatric testimony. In reforming the death sentence, we noted the absence of psychiatric evidence presented by the State. *Id.*, 728 S.W.2d at 390.

In *Warren v. State*, 562 S.W.2d 474 (Tex. Cr.App.1978), we specifically noted: "There was no qualified psychiatric testimony as to appellant's psychiatric makeup, which has been held to have probative value as to the "future dangerousness" punishment issue. *Id.*, 562 S.W.2d at 476. (Citations omitted.)

The only character evidence established appellant to be non-violent and his reputation for non-violence to be good. Appellant's family testified as to his non-violent and non-confrontational nature. Such evidence does not support a conclusion that appellant will be a continuing threat to society.

Considering the lack of prior criminal history, there being no psychiatric evidence, and the uncontested testimony of appellant's non-violent character, the fourth, seventh and eighth *Keeton* factors militate against a finding of future dangerousness.

C. Personal Circumstances and Duress

Finally, the fifth and sixth *Keeton* factors require consideration of appellant's age and personal circumstances, and whether he was acting under duress.

1.

At the time of the offense, appellant was twenty years old, had a 10th grade education and was attempting to graduate from a technical school. The evidence shows appellant had not eaten but had consumed thirteen alcoholic beverages in the course of the evening. Appellant vomited soon after his arrest and several witnesses testified to his intoxicated appearance several hours after the instant offense. Additionally, appellant testified he did not recall the events surrounding the actual stabbing.

Appellant testified he was afraid of Wortmann. Appellant and Wortmann had very little money prior to the offense. Wortmann told appellant if he wanted to go to North Beach to rejoin his friends they needed money for gas. It was at this point appellant and Wortmann discussed the robbery.

2.

The appellant's age at the time of the offense is a significant factor toward whether he poses a continuing threat to society.[6] In *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), Justice Souter explained the dual nature of youth as a mitigating factor:

> ... Youth may be understood to mitigate by reducing a defendant's moral culpability for the crime, for which emotional and cognitive immaturity and inexperience with life render him less responsible ... and youthfulness may also be seen as mitigating just because it is transitory, indicating that the defendant is less likely to be dangerous in the future.

*Id.*, 506 U.S. at 518, 113 S.Ct. at 924 (Souter, J., dissenting). (Citation omitted.) *See also, Eddings v. Oklahoma*, 455 U.S. 104, 115–116, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).

Youth as a mitigating factor is particularly important in capital cases where a sentence of death is imposed. In *Johnson v. Texas*, the Supreme Court approved of our inclusion of youth as a consideration in our review of whether the evidence supports an affirmative finding of the "future dangerousness" punishment issue. *Id.*, 509 U.S. at 371, 113 S.Ct. at 2671 (citing *Ellason v. State*, 815 S.W.2d 656,

---

**5.** The majority argues appellant's future dangerousness is indicated by his underage drinking. While not to be condoned, underage drinking should not be considered a serious offense. Moreover, it is a crime limited exclusively to youth in that upon reaching twenty-one a defendant cannot be punished for this offense. Therefore it cannot indicate *future* dangerousness.

**6.** I discussed the following line of cases in *Wilkerson v. State*, 881 S.W.2d 321, 340 (Tex.Cr.App. 1994) (Baird, J. dissenting).

660 (Tex.Cr.App.1991); *and, Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980)). The Supreme Court emphasized the significance of youth as a relevant mitigating factor:

> There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the [constitutional] requirements. Our cases recognize that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage" ... A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence.

*Johnson,* 509 U.S. at 365–368, 113 S.Ct. at 2668–2669. (Citations omitted.)

In *Ellason,* we acknowledged that while a defendant's age "at the time of offense is insufficient, standing alone to prevent imposing the death penalty, youth by its very nature is a mitigating factor to be noted and considered." *Id.,* 815 S.W.2d at 663.

As noted above, appellant was twenty years old when he committed the instant offense. The recklessness and violence of appellant's actions are undoubtedly a derivative of his youth. While this, at first glance, appears to be an aggravating circumstance, appellant's reckless violence may be aberrational because "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.,* 509 U.S. at 367–69, 113 S.Ct. at 2669.

Appellant's age at the time he committed the instant offense falls within a range we have considered to be mitigating. *See, Beltran, Huffman, and, Warren, all supra.* Moreover, we have not limited our consideration of a defendant's youth to his teenage years. In *Huffman,* we held the defendant's

youth mitigated towards reforming his sentence even though he was twenty-two when he committed the offense. In *Beltran* and *Warren,* the Court considered each defendant's youth despite the fact that each was twenty-five when the offenses were committed. Comparing appellant's case to these other cases, it is worthy of note that appellant, at the time of the instant offense, was two years younger than Huffman, and five years younger than Beltran and Warren.

This Court also considers the part that appellant's alcohol consumption played in the commission of the instant offense. *Keeton,* 724 S.W.2d at 61. A rational jury could conclude appellant was intoxicated at the time of the offense. Appellant had consumed thirteen different types of alcoholic beverages in a short period of time on an empty stomach. This Court has held that a defendant's intoxication at the time of the offense *may be a mitigating factor with regard to punishment. Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Cr.App.1988); *Wilkerson,* 881 S.W.2d at 324.

In *Huffman,* the defendant strangled the victim in the course of robbing her. *Id.,* 746 S.W.2d at 216. The defendant stated he had been using drugs and drinking and that he suffered a "blackout" and could not remember committing the crime. *Ibid.* The defendant had a history of alcohol and drug abuse and it was possible that the defendant's alcohol and drug use on the night of the offense caused the blackout. We held the evidence was insufficient to prove future dangerousness. *Id.,* 746 S.W.2d at 225.

Whether the defendant was acting under the influence or duress of another at the time the offense is an additional factor to be considered. *Keeton,* 724 S.W.2d at 61. In the instant case, appellant had no prior record for any criminal acts, nor any history of violence. Appellant was informed of Wortmann history of violence and robbery. Additionally, it was Wortmann who told appellant how easy it was to commit the robbery and that there was little chance of discovery. Finally, it was Wortmann who told appellant if he was to rejoin his friends appellant would have to come up with some money for gas.

Appellant testified to being afraid of Wortman.

In *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S.Ct. 2687, 2698, 101 L.Ed.2d 702 (1988), the Supreme Court endorsed the principle that:

> ... [L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult ... Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is *much more apt to be motivated by mere emotion or peer pressure than is an adult.* The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.

The Supreme Court recognized the combination of youth, peer pressure and inexperience can heavily influence a defendant to do things which he normally would otherwise not do. *Ibid.*

Appellant's youth, his intoxication and his fear of Wortmann establish that appellant was acting under the influence or duress of Wortmann. While peer pressure does not excuse a defendant's culpability for criminal acts, one so influenced is less blameworthy than if he had initiated and participated in this crime entirely on his own. *Wilkerson,* 881 S.W.2d at 342 (Baird, J. dissenting). Consequently, the fifth and sixth *Keeton* factors militate against a finding of future dangerousness.

### D.

As noted in part II, the majority's *Keeton* analysis is flawed and incomplete. Furthermore, the majority refuses to follow our holding in *Smith,* a case directly on point which, under the doctrine of *stare decisis,* mandates a reformation of appellant's sentence. When a thorough *Keeton* analysis is conducted and our precedent consulted, it is clear the evidence is insufficient to support a finding of future dangerousness. Therefore, I would sustain appellant's first point of error.

### IV.

Because the Eighth Amendment forbids punishment assessed arbitrarily or capriciously, we have the duty of ensuring death sentences are imposed in an evenhanded, rational and consistent manner. We discharge this duty by reviewing the jury's answers to the punishment issues in light of the factors adopted in *Keeton, supra.* Today, the majority shirks that responsibility and issues an opinion that insulates jury verdicts from meaningful appellate review. The majority opinion will only serve to encourage the sparse, selective and spotty application of capital punishment in Texas. In light of the majority opinion, there is no longer any assurance that the death penalty will not be wantonly or freakishly imposed.

With these comments, I join that portion of our judgment affirming appellant's conviction but dissent to the majority's failure to reform appellant's punishment from death to life imprisonment.

MALONEY, Judge, concurring and dissenting.

The majority holds the evidence sufficient to support the jury's affirmative answer to the second special issue based on the facts of the offense alone. This opinion will probably set precedent ensuring that never again will there be facts that this Court will find insufficient to support an affirmative answer to the second special issue. Because such is contrary to caselaw and flies in the face of the principles underlying *Furman* and *Jurek,* I dissent to the majority's resolution of point of error one, but concur in affirming appellant's conviction.

### I.

We should remain always cognizant of the confines of *Furman* and *Jurek* in reviewing sufficiency of the evidence. *Heiselbetz v. State,* 906 S.W.2d 500, 515 (Tex.Crim.App. 1995). In *Heiselbetz,* the jury's affirmative answer to the second special issue, rested "virtually on the fact that the offense was a double murder of a mother and child by strangulation." *Id.* at 513 (Maloney, J., concurring). In a case where the death penalty is based virtually, if not exclusively, on the

facts of the offense alone, we must recall the circumstances giving rise to our current death penalty statute:

> ... the Texas death penalty scheme was amended by the Legislature to more narrowly identify the offenses implicating the death penalty and focus the jury's decision-making process at sentencing.... Accordingly, not every capital murder calls for imposition of the death penalty; it may be imposed only upon a narrow factfinding by the jury who answers yes to two or three specific questions. This Court emphasized in *Keeton v. State*, 724 S.W.2d 58, 64 (Tex.Crim.App.1987):

>> ... we are bound by the law to make certain that the death penalty is not "wantonly or freakishly" imposed, and that the purposes of the jury's consideration of the [ ] special issues ... are accomplished. *Every murder committed in the course of robbery is in some way cold-blooded and senseless. Each such murder does not, however, merit the death penalty, our most final punishment.*

It is against this historical backdrop that we should review sufficiency of the evidence on the special issues, keeping in mind that the Legislature has narrowly defined the circumstances under which a defendant is deathworthy. For this reason, *a defendant is not automatically sentenced to death upon a conviction of capital murder. The State is still required to prove the special issues beyond a reasonable doubt, separate and in addition to proving the defendant's guilt.*

*Id.* at 515 (Maloney, J., concurring) (emphasis added). If the facts of the offense alone are generally sufficient to prove deathworthiness, there would be no need for the special issues.

While this Court has recognized that the facts of the offense alone can, where shocking enough, support an affirmative answer to the *second* special issue, cases in which the facts alone have been held to support such verdict stand in stark contrast to the facts of the instant case. A sampling of these cases are described below in order to illuminate the contrast between them and the instant case.

II.

In *King v. State*, 631 S.W.2d 486, 504 (Tex.Crim.App.), *cert. denied*, 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982), the defendant and a co-defendant abducted a young couple at gunpoint and forced them into their truck. They drove to a secluded area and beat the young man repeatedly in the head with the butt of a shotgun, causing his death. The defendant and his cohort spent the remainder of the night, several hours, taking turns sexually assaulting the girl. They let her go, but threatened death if she went to the police.

We said:
> ... Considering the random selection of his young victims, the calculated, remorseless brutality of the manner in which he obliterated another human life and the levity with which he exploited the terror he generated in the female witness to this atrocity, this Court cannot say that the jury would have been unjustified in returned their verdict of "yes" to the second special issue based alone on the facts of the offense.

*Id.*

The kidnaping and murder of three victims was held sufficient to alone support the jury's finding of future dangerousness in *Cass v. State*, 676 S.W.2d 589, 593 (Tex.Crim.App. 1984). There, the victims were held hostage for two days while the defendant and his accomplices prepared a common grave. The victims were gagged and bound, sedated with tranquilizers and each shot between seven and nine times. A .45 caliber machine gun was one of the weapons used. According to the defendant's confession, when one of the victims tried to escape from the grave, the defendant shot him in the back of the head, drug him back to the grave and "threw him in." We said "the shocking circumstances of the offense established and appellant's primary role in it surely evince a 'most dangerous aberration of character' " such that "we [could] not say the jury was unjustified in returning their verdict of 'yes' to the second special issue based alone on the facts of the

offense." *Id.* In *Guerra v. State*, 771 S.W.2d 453 (Tex.Crim.App.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989), the Court viewed the facts alone as heinous enough to support an affirmative answer to the second issue:

> The evidence shows that appellant and his companion armed themselves with pistols on the day of the offense. Without provocation, appellant cold-bloodedly shot Officer Harris three times in the head and then began shooting at various bystanders, including Herlinda Garcia and Vera Flores. While effecting his escape, appellant also killed Jose Armijo, Sr., who was innocently sitting in his car with his two small children. Clearly the facts of this brutal and heinous offense are sufficient in and of themselves to justify the jury's affirmative answer to the second special issue.

*Id.* at 462.

In *Willis v. State*, 785 S.W.2d 378, 387 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990), we held "the nature of this offense is so extreme that a rational trier of fact could have reasonably answered the second special issue in the affirmative based solely on the facts of the offense." We described the offense as follows:

> The facts of this crime demonstrate an utter disregard for human life; indeed, they depict a man so determined to murder the very people with whom he earlier socialized that he effectively sealed off their escape routes by pouring an accelerant on the door jams to their bedrooms and on the front and back doors to the house immediately before sending the house up in flames. Appellant succeeded in killing two women, and seriously endangering the life of his own cousin. When the fire fighters began to arrive, appellant did not volunteer the information that two women were trapped inside the smoldering house. Instead, he impassively smoked cigarettes while watching the fire fighters battle the blaze.

*Id.* at 386–87.

In *Madden v. State*, 799 S.W.2d 683 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991), we held the facts alone supported the affirmative finding on the second issue:

> Appellant not only murdered Herbert Megason in the course of robbing him, but he also brutally murdered Herbert's son Gary. Gary's right foot and both hands were "hog-tied", his throat severed execution style, and his arms had numerous defensive wounds. Both bodies were disposed of in a creek and carefully hidden by brush. Although there was no evidence that the violence against the Megasons was long in contemplation and planning or originally intended by appellant [citations omitted], the facts evidence a crime committed by someone with a total lack of regard for human life. [citations omitted] We conclude without consideration of the other punishment evidence presented by the State, the extremely violent nature of this offense was sufficient to sustain the jury's affirmative answer to the second punishment issue.

*Id.* at 694.

In *Cantu v. State*, 842 S.W.2d 667 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993), the defendant attacked a ninety-four year old woman in the front yard of her home, sexually assaulting her and beating her head against the concrete causing her death:

> In this case, appellant dragged the screaming 94–year–old victim across her patio and then threw her over a four-foot-high chain link fence. Appellant then sexually assaulted the victim both vaginally and anally. During the course of the assault, appellant penetrated the victim with a large piece of wire, causing severe lacerations to her vagina. After raping the victim, appellant bashed the victim against the cement causing the fatal injuries to the victim's head. There were also multiple impact injuries to the victim's neck, trunk, and extremities.

*Id.* at 675–76. We viewed these facts as sufficient to support the jury's finding of future dangerousness. *Id.* at 676.

In *Vuong v. State*, 830 S.W.2d 929, 935 (Tex.Crim.App.), *cert. denied*, 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992), we

stated the jury's affirmative answer to the second special issue was supportable solely on the evidence presented at guilt/innocence. In that case, the defendant entered a pool room and cafe armed with a semi-automatic rifle. The defendant proceeded through the establishment firing his weapon. Of eleven shots fired, he struck seven patrons, killing two. He was described as taking deliberate aim at his unarmed victims. *Id.* at 933.

Although the State offered no evidence of the defendant's future dangerousness other than the facts of the offense in *Sonnier v. State*, 913 S.W.2d 511, 517 (1995), we upheld the verdict:

> Appellant heinously murdered M. Flowers and her two-year-old son. M. Flowers' murder involved needless and vicious brutality; Appellant stabbed, strangled, bludgeoned her head with the claw of a hammer, and crushed her neck by stomping it. The condition of the apartment suggested that appellant followed M. Flowers, stabbing and beating her throughout her apartment as she apparently struggled for her life and the lives of her children. The murder of P. Flowers, an infant still learning to speak, was wanton; the infant was fatally stabbed through the heart as he lay on his bed and his body was dragged to the bathroom where it was tossed in the bathtub atop his mother's corpse. He was stabbed eight times. The jury could rationally conclude from the results of appellant's isolated rage that his rage is of such an uncontrollable and extreme nature that he is a continuing danger to society.

*Id.*

All of the cases that I have found in which the Court recognized or held that the jury's verdict on the second special issue was supportable on the facts of the offense alone involve either the killing or the terrorizing of more than one victim, and/or the threatening or endangering of the lives of persons besides the victim, and/or calculated planning and forethought.[1] I am sure that if I have missed a case in which the facts were *less* heinous than those above described, the majority would have cited it. The instant case involves neither multiple victims, terrorizing of the victim or others, threatening or endangering of the lives of others besides the victim, nor considerable planning.

### III.

The majority places great weight on the fact that the murder was committed with a

---

1. *See, e.g., Ford v. State,* 919 S.W.2d 107 (Tex. Crim.App.1996) (mandate issued April 19, 1996) (terrorizing of entire family in their own home, shooting three and killing one); *Dinkins v. State,* 894 S.W.2d 330 (Tex.Crim.App.1995) (double murder, victims shot at close range as they crouched or kneeled on floor, one victim "hunted down" and killed merely to eliminate a witness), *cert. denied,* —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *Sonnier v. State,* 913 S.W.2d 511 (Tex.Crim.App.1995) (murder of mother and two-year-old son where mother stabbed, strangled and bludgeoned with hammer, and stomped on, and son stabbed eight times); *Johnson v. State,* 853 S.W.2d 527 (Tex.Crim.App.1992) (murder of two men in order to eliminate witnesses to robbery, one killed while pleading for his life), *cert. denied,* —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993); *Vuong,* supra (random shooting of seven patrons in pool room and cafe, killing two); *Cantu,* supra (ninety-four year old victim attacked in her yard, sexually assaulted and head beat against concrete); *Madden,* supra (brutal murder of father and son); *Sosa v. State,* 769 S.W.2d 909 (Tex.Crim.App.1989) (planned robbery for weeks, threatened lives of bank employees during robbery, killed deceased as he lay in trunk of car) *Willis,* supra (Tex.Crim.App. 1989) (murder of two women by arson); *Bower v. State,* 769 S.W.2d 887 (murder of four victims by shooting at close range), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989), *overruled on other grounds, Heitman v. State,* 815 S.W.2d 681, 685 n. 6 (1991); *Guerra,* supra (murder of police officer followed by shooting at and killing of innocent bystanders); *Moreno v. State,* 721 S.W.2d 295 (Tex.Crim.App.1988) (murder of six people, kidnapping and robbery of six others); *Santana v. State,* 714 S.W.2d 1 (Tex. Crim.App.1986) (defendant needlessly jeopardized more lives than that of the deceased and the offense was likened to "a terrorist attack" which was planned and professional in its execution); *Cass,* supra (kidnapping and murder of three victims over space of two days); *King,* supra (deceased's murder, committed while companion forced to look on, was followed by hours of sexual assault of deceased's companion); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Crim.App. 1979) (murder of defendant's child by poisoning with Halloween candy, planned for at least ten months and carried out with cold calculation in order to collect life insurance proceeds), *cert.*

knife.[2] While the use of a knife is undoubtedly *probative* of a defendant's future dangerousness, it should not be the sole basis upon which a determination of future dangerousness is made. In *Smith v. State*, 779 S.W.2d 417 (Tex.Crim.App.1989), the victim was tied to her bed and sexually assaulted, she was then untied and stabbed fourteen times, once through the heart. We held the facts of that offense alone insufficient to support an affirmative answer to the second special issue. We said,

> It has been said that § 19.03 of the Penal Code "limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses." *Jurek v. State*, 522 S.W.2d 934, at 939 (Tex.Cr.App. 1975). To hold the offense itself in this cause was sufficient to prove future dangerousness would threaten to undermine the function of Article 37.071, supra, to further narrow the class of death-eligible offenders to less than all those who have been found guilty of an offense as defined under § 19.03. See *Roney v. State*, 632 S.W.2d 598, at 603 (Tex.Cr.App.1982).

*Id.* at 420.

The majority's attempt to distinguish *Smith* is disingenuous. The majority differentiates the instant case from *Smith* by pointing out that appellant entered the store with the intention of using the knife to threaten the clerk. The majority also finds significant Smith's testimony that after raping the victim, he "decided to kill her and went kind of crazy for a few minutes," but appellant offered no explanation for his stabbing of the clerk. These "distinctions" have no significance. The evidence in *Smith* also supported a conclusion that the defendant entered the victim's apartment with a knife and that he was looking for victims that day. Smith's "explanation" for his actions was not so pivotal in that case as to serve as the basis for distinguishing the instant case. The murder committed in *Smith* was certainly as, if not more, brutal than the murder committed in the instant case. Yet we held the evidence insufficient to support an affirmative answer to the second issue because to hold otherwise "would threaten to undermine the function of Article 37.071 ... to further narrow the class of death-eligible offenders to less than all those who have been found guilty of an offense as defined under § 19.03." *Id.*

The majority also seeks to support its holding by emphasizing "the number of lies" appellant told to the police. The only "lies" described in the majority's opinion follow:

> Appellant is shown to have given conflicting statements at different times as to the exact course of events after he exited the store. In one, Wortman was driving slowly in order for him to jump into the car, while in another, Wortman had taken off and appellant went running after him.

*Majority opinion* at 695 n. 4. These statements are not necessarily inconsistent. Moreover, even if they are "conflicting," they do not by any measure amount to a "number of lies." The Court also stresses the fact that "the majority"[3] of the knife wounds

---

denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980).

**2.** The majority says the use of a knife forces the user to be in close proximity to the victim and often requires more than one thrust, citing *Dinkins*, supra. *Majority opinion* at 696. In a parenthetical, the majority describes *Dinkins* as holding the evidence of future dangerousness sufficient "where one victim was shot twice at extremely close range and she was either kneeling or sitting." *Id.* *Dinkins* was a double murder case. The Court found more significant than the close proximity of the shots, the manner in which the defendant sought out and killed the second victim:

> Appellant shot [the first victim] twice; both shots were fired at extremely close range and both shots were fatal. Significantly, appellant

shot [the first victim] in the head as she was kneeling or sitting on the floor after the infliction of the first wound to her abdomen.... Of even greater significance for our review is the indication that appellant spent considerable effort in hunting down the second deceased [ ] before killing her. After [the second victim] locked herself into an adjacent room, appellant attempted to get in by shooting the doorknob. Appellant then tore down a wicker shelf covering a receptionist window, broke the window, reached inside and shot [the second victim] as she crouched in a corner.

*Dinkins*, 894 S.W.2d at 359–60.

**3.** The Court described the offense, in part, as follows:

> Appellant then stabbed the deceased approximately two or three times before the deceased fell facedown and motionless on the floor. Ap-

were in the victim's back after he had fallen. Can the fact that a "majority" of the wounds were inflicted on the victim as he lay face-down be meaningfully distinguished from a scenario where wounds were inflicted on the victim's chest immediately following the terrorizing of the victim, such as that which occurred in *Smith?* Could it not be just as telling, or more so, that a defendant faces his victim while inflicting the fatal wounds?

The Court's contortion of the facts in this case is transparent. This case involved the murder of a store clerk in the course of a robbery. The clerk was killed with a knife. It was senseless and, as with all murders, brutal. But on these facts, the Court's holding renders article 37.071 a nullity. Further, in light of contrary precedent the Court's holding exemplifies wanton and freakish imposition of the death penalty. I therefore disagree with the court's resolution of appellant's first point of error relating to punishment and would affirm the conviction, but reform the punishment from death to life imprisonment.

OVERSTREET, J., joins.

pellant then thrust the knife into the deceased's back several more times before exiting the store.
*Majority opinion* at 694–695. Apparently assuming that since "several" is more than "two or three," the Court concludes that it amounts to a "majority."