

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### AP-75,478
---

### LISA ANN COLEMAN, Appellant

### v.

### THE STATE OF TEXAS

---
### ON DIRECT APPEAL FROM CAUSE NO. 1016470R
### IN THE 297TH JUDICIAL DISTRICT COURT
### TARRANT COUNTY
---

**Per Curiam.  Price and Womack, JJ., concurred.**

### O P I N I O N

Lisa Ann Coleman was charged with capital murder and with two counts of injury to a child committed in July 2004.  Count Three, injury to a child, was severed on April 18, 2006.  On June 19, 2006, a jury convicted Coleman of capital murder in Count One.[1]  Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Coleman to death for Count

---

[1] T EX. PENAL CODE ANN. § 19.03(a)(2).

One only.[2] For Count One, direct appeal to this Court is automatic.[3] After reviewing Coleman's points of error relating to her capital murder conviction and death sentence, we find them to be without merit. Accordingly, we affirm Coleman's conviction and death sentence for Count One.

The jury also convicted Coleman of injury to a child in Count Two and assessed a ninety-nine year sentence. Coleman's points of error challenging this conviction and sentence are not before us.[4] Therefore, we dismiss those claims.

## I. Sufficiency of the Evidence

### A. Facts

On July 26, 2004, Marcella Williams, Coleman's lover, found her nine-year-old son Davontae unconscious and called 911. While en route to Williams's apartment, firefighter and paramedic Troy Brooks stated that the dispatcher changed the call from "breathing difficulty" to "full arrest." When he arrived, Davontae was lying on the bathroom floor clad in a disposable diaper. Brooks testified that Davontae appeared "emaciated" and looked as if he was only three to five years old. Brooks immediately realized that Davontae was dead; his body was already in full rigor mortis, which usually occurs several hours after death.

---

[2] TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(g).

[3] *Id.* at § 2(h).

[4] *See Callins v. State*, 726 S.W.2d 555, 558 (Tex. Crim. App. 1986) (holding that appeals of non-capital convictions, even when obtained in the same trial as a murder conviction in which the death penalty was assessed, are properly reviewed by the intermediate court of appeals on direct appeal).

This "shock[ed]" Brooks because Williams had told him that Davontae had just eaten and thrown up and that Williams and Coleman had been washing him. Brooks also noticed that Davontae had a few "dirty bandages" on his arms. Vanessa Sheriff, a paramedic, testified that Williams told her that she tried to feed Davontae Pediasure. Williams also said that Davontae was breathing when she called 911. Sheriff believed this statement "did not match with what [she saw] on the bathroom floor." Both Brooks and Sheriff noticed that Davontae had traces of yellow vomit or bile around his mouth and nose. Sheriff believed that the appearance of vomit was consistent with the liquid Pediasure.

Dr. Daniel Konzelmann conducted the autopsy. Dr. Konzelmann determined that Davontae's death was a homicide and that the direct cause of death was malnutrition coupled with slight pneumonia. Davontae weighed less than forty pounds at the time of his death. Dr. Konzelmann determined that Davontae was malnourished because Davontae's body lacked subcutaneous fat cells. He also cited the lack of fat cells surrounding Davontae's heart as very unusual. Dr. Konzelmann also explained how the external injuries to Davontae's body contributed to his death:

> I believe that some of these injuries were infected and that it's possible that this did relate to the pneumonia that he had. Also some of these were evidence to me that he had been bound and that this would have prevented him from either seeking care on his own or getting food on his own.
>
>                                      . . .
>
> Malnutrition will depress the immune system. That is, there are cells in the body that are designed to recognize invaders and deal with them, and that takes energy. As someone becomes more malnourished, their system is less able to protect themselves.

Dr. Konzelmann noted evidence indicating that Davontae had been continuously bound. Davontae had numerous linear marks on his wrists. Some of the marks were scarred, indicating wounds that had healed, and some of the marks were "giant sores[s]," indicating that they were not healing. This demonstrated a pattern of restraint. Davontae's ankles had similar markings. Davontae's ear had a significant wound that was beginning to heal. His lower lip had an ulceration and a tear that would make it hard for Davontae to eat and drink. It appeared that Davontae had chicken-noodle soup before he died but, according to Dr. Konzelmann, "it was inadequate, too late, and possibly too much."

Dr. Nancy Kellogg, a board-certified pediatrician and specialist in child abuse, identified at least 250 distinct injuries to Davontae, including cigarette or cigar burn wounds and numerous ligature marks on his arms and legs. Kellogg described the starvation of a child as "very rare" and "unusual." However, based on the ligature marks, she concluded that Davontae was intentionally starved to death. Davontae had been restrained from accessing food. Based on a review of Davontae's medical records from December 2002, Dr. Kellogg opined that Davontae had a "normal growth velocity" for a child his age. This indicated that he did not suffer from a disease that would stunt his growth. In the months before his death, however, Davontae's weight spiked downward and he stopped growing. The physical stress caused Davontae's hair growth to be abnormal; he had hair growing in places where hair does not normally grow. Such growth is typically seen in people who are anorexic.

Detective Jim Ford questioned Coleman while investigating Davontae's death. Coleman told Detective Ford that she lived with Williams about half of the time and with her son and mother the other half. She used to beat Davontae with a belt but stopped in February or March of 2004 because the beatings left welts. She stated that she and Williams tied up Davontae on several occasions. Recalling the night that Davontae died, Coleman stated that Williams woke her up screaming. Williams attempted to administer CPR to Davontae, and Coleman said that she put Davontae in a warm bath to revive him. Coleman did not know how Davontae injured his arms and legs.

Davontae's sister, Destinee, who was eight at the time, testified that Coleman would tie Davontae up with an extension cord in the bathroom. When Davontae was tied up, he "couldn't move around much" and did "[n]othing."

Child Protective Service (CPS) Investigators Jennifer Deible and Edna Campbell testified that Davontae was removed from Williams's home and placed in foster care in 1999 because Coleman physically abused him. Davontae was returned to Williams's custody about a year later. After her arrest in this case, Coleman told the two that she bruised Davontae by beating him with a belt in 2004. She spoke to her mother about the incident, and her mother told her to not to touch Davontae. She admitted that she tied up Davontae on two occasions with clothing to keep him from hurting himself or others. According to Campbell, Coleman said that Williams did not want to take Davontae to the doctor because she was afraid that the bruises and marks would prompt a doctor to call CPS. Coleman

admitted to Campbell that she had hit and pushed Davontae, causing him to split his lip. She also told Campbell that Williams did not want Davontae to go to school because Williams was afraid that he would report the abuse and that school officials would call CPS. Coleman stated that Davontae had been tied up regularly since June and that the sore on his arm was caused by him fighting to be released. The pantry door had a lock on the top of the door frame, and investigators discovered a dry urine stain on the floor. But Coleman denied locking Davontae in the pantry. Coleman also said that Davontae had been sick for about a month before his death. He did not eat very much when fed, and he would throw up. Coleman stated that, in an attempt to help Davontae, she and Williams gave him a variety of over-the-counter medicines.

Dr. Lesther Winkler, a pathologist, testified for the defense. He stated that Davontae died from aspiration pneumonia, which "is the result of sucking food or particles of material which don't go into the stomach properly through the esophagus and are sucked instead into the trachea," which leads to the lungs. Dr. Winkler noted aspirated material in Davontae's lung and that his right lung was twice the size of his left because of the aspirated material. Dr. Winkler disagreed with Dr. Konzelmann's determination that the absence of fat around Davontae's heart was significant. In his opinion, children rarely have fat around the heart. As for the malnutrition, Dr. Winkler agreed that Davontae was malnourished; there was no evidence that Davontae was unable to metabolize food.

Dr. Nizam Peerwani, the Chief Medical Examiner with Tarrant County, also examined

Davontae's body during the autopsy. The State called him to testify to rebut Dr. Winkler's testimony. He stated that a normal person does not aspirate and die and that there was no reason to suggest that Davontae aspirated given his medical history. Viewing the "entire picture," Dr. Peerwani stated, "even if he had aspirated, the pneumonia is not a very significant component in this child's death. Perhaps the most dramatic component is malnourishment . . . . He died because of malnutrition."

## B. Analysis

In points of error two and three, Coleman alleges that the evidence supporting her conviction for injury to a child is legally and factually insufficient. Coleman also addresses the jury's findings of guilt for injury to a child as alleged in Count Two. Her conviction and sentence in Count Two, however, are not before this Court.[5] Points of error two and three are therefore dismissed.

In her fourth point of error, Coleman contends that the evidence is legally and factually insufficient to support the jury's findings that she kidnapped Davontae. Because Coleman combines more than one legal argument in a single ground, we could reject her claims on the ground that nothing is presented for review.[6] Nevertheless, we will address both of her arguments. In points of error seven and eight, Coleman alleges that the evidence is legally and factually insufficient to show that she intentionally caused Davontae's death.

---

[5] *See Callins*, 726 S.W.2d at 558.

[6] T EX. R. APP. P. 38.1(e), (h).

Under *Jackson v. Virginia*, when deciding whether evidence is legally sufficient to support a conviction, we assess all of the evidence in the light most favorable to the verdict to determine whether "*any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt."[7]  Evidence is factually insufficient when, although legally sufficient under a *Jackson* analysis, the evidence is "so weak" that the verdict "seems clearly wrong or manifestly unjust" or "against the great weight and preponderance of the evidence."[8]  A factual sufficiency review is "barely distinguishable" from a *Jackson v. Virginia* legal sufficiency review.[9]

### 1.  Kidnapping

A person commits the offense of kidnapping if she intentionally or knowingly abducts another person.[10]  "Abduct" means to restrain a person with intent to prevent the person's liberation, and it can be accomplished in two ways: (1) "secreting or holding the person in a place where the person is not likely to be found;" or (2) "using or threatening to use deadly force."[11]  "Abduct" includes two elements—an *actus rea* requirement and a *mens rea*

---

[7]  443 U.S. 307, 319 (1979) (emphasis in original).

[8]  *Watson v. State*, 204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006).

[9]  *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

[10] T EX. PENAL CODE ANN. § 20.03.

[11] T EX. PENAL CODE ANN. § 20.01(2).

requirement.[12] Under the *actus rea* requirement, the defendant must have restrained another person.[13] And under the *mens rea* requirement, the defendant must have had the specific intent to prevent a person's liberation.[14]

Secreting or holding another person where the person is unlikely to be found is part of the *mens rea* requirement of the offense.[15] Thus, the State is not required to prove that the defendant actually secreted or held another;[16] it must prove that the defendant restrained the other person with the specific intent to prevent liberation by secreting or holding the person.[17] The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place where the person is unlikely to be found.[18] Intent may be inferred from an accused's conduct, remarks, and the surrounding circumstances.[19]

Coleman argues that the evidence shows only that she tied up Davontae for a short time with clothing and therefore nothing established that the restraint was capable of causing

---

[12] *Brimage v. State*, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1994).

[13] *Id*. at 476.

[14] *Id*.

[15] *Id*. at 475.

[16] *Id*. at 476.

[17] *Id*.

[18] *Id*. at 475.

[19] *See Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980).

death or serious bodily injury, or that she intended to cause death or serious bodily injury. Additionally, Coleman argues that the evidence presented indicates only that she may have restrained Davontae for a short time in his own home, which is where one would expect to find a child. Finally, Coleman argues that it is apparent that Davontae's mother acquiesced in the restraint.[20]

First, that Williams may have acquiesced in the restraint is of no consequence. The record shows that Williams and Coleman acted in concert. But Coleman restrained Davontae without his consent and did so through the use of force and intimidation.[21] The numerous ligatures marks themselves are evidence of force. Destinee testified that Coleman used an extension cord to tie up Davontae in the bathroom. And Coleman admitted that she physically abused Davontae. Thus, there was evidence that Coleman used force and intimidation to restrain Davontae.

Additionally, that Davontae was restrained in his own home did not preclude the jury from inferring that Coleman intended to secret or hold Davontae in a place where he was unlikely to be found. We have recognized that a rational factfinder can infer the intent to secret or hold a person in a place where that person is unlikely to be found when a defendant isolates a person from anyone who might be of assistance.[22]

---

[20] *See* TEX. PENAL CODE ANN. § 20.01(1)(B)(i).

[21] *See* TEX. PENAL CODE ANN. § 20.01(1)(A).

[22] *Fann v. State*, 696 S.W.2d 575, 576 (Tex. Crim. App. 1986); *Laster v. State*,

(continued...)

Dovantae began first grade in 2002. Williams pulled him out of school in mid-November, before the holidays. Before that, Davontae's teacher, Jean Ann Stokes, noticed that Davontae had a difficult time adapting to the classroom. He did not take non-verbal cues from Stokes or his classmates. Stokes and the cafeteria staff noticed that Davontae was always hungry. The cafeteria staff would usually find extra food to give him. Stokes also noticed that Davontae had some "markings" on his body that concerned her. She and the school's counselor reported all of this to CPS. Davontae spoke to a man from CPS on the phone, but Stokes could not hear what he asked Davontae. In November, Stokes developed a plan for Davontae to take part in an alternative program so he could learn how school works. Before the plan could be implemented, Davontae disappeared from school and never returned.

Coleman told CPS investigators that Williams did not want Davontae to go to school or to a doctor because she was afraid that Davontae would report the abuse and someone would call CPS. Coleman did not defy Williams, and the record indicates that the two acted in concert. Destinee testified that Davontae was tied up in the bathroom. Also, according Coleman's own statement, Davontae had been restrained inside the home since June 2004. Further, a reasonable jury could have inferred that the restraint began earlier. Malnutrition, according to the State's experts, occurs over an extended period of time.

_____

[22](...continued)
275 S.W.3d 512, 522 (Tex. Crim. App. 2009).

Finally, Coleman told CPS investigators that anyone who inquired into Davontae's whereabouts was informed that he was "with his mother's people," even though Davontae was at home. Coleman's statement was supported by testimony from Williams's sister. Latravier Williams testified that Coleman and Williams came to her house with Williams's daughters, and when she asked where Davontae was, both Coleman and Williams told her that he was with another family member.

Ordinarily, it would seem counterintuitive to believe that a child, located in the home, has been secreted or held in a place where the child is not likely to be found. But when the evidence shows, as it does in this case, that the perpetrator makes a concerted effort to prevent outsiders and even family members from looking for the child at home so as to deny access to the child, the evidence suffices to establish the perpetrator's intention to make the home a place where the child is not likely to be found.[23] Here, the evidence shows that Williams and Coleman took several deliberate measures to deflect outsiders interested in Davontae from looking for him at home and having access to him.[24] The facts and circumstances of this unusual case make it comparable to a situation in which a perpetrator confines a child in a hidden compartment inside the child's own home. Such a circumstance would be more than sufficient to prove, beyond a reasonable doubt, the requisite intent to

---

[23] *Laster*, 275 S.W.3d at 521 ("Secreting or holding another where he or she is unlikely to be found is part of the *mens rea* requirement of the offense—not the *actus reus*.") (citing *Brimage v. State*, 918 S.W.2d 466, 476 (Tex. Crim. App. 1994)).

[24] *See id.* at 522.

secret or hold the child in place where the child is unlikely to be found.

When the evidence is viewed in the light most favorable to the verdict, a rational trier of fact could have found that Davontae was kidnapped. Further, the evidence is not so weak that the jury's determination is clearly wrong and manifestly unjust. Nor is the jury's determination that Davontae was kidnapped against the great weight and preponderance of the evidence. Because the evidence of kidnapping is both legally and factually sufficient, we overrule Coleman's fourth point of error.

### 2. Cause of Death

Coleman argues that the evidence is legally and factually insufficient to show that she intentionally caused Davontae's death. While the State and defense presented competing expert opinions about the cause of Davontae's death, the jury could have inferred from the evidence that Davontae's death was caused by malnutrition rather than aspiration pneumonia. The jury was presented with evidence of intentional starvation. Davontae had been healthy and growing in 1999, and his starvation was not based on metabolic factors. Dr. Kellogg testified that there was no food matter in Davontae's system beyond his stomach. This showed that he had not eaten regularly. Dr. Kellogg and Dr. Peerwani concluded that Davontae was malnourished and that an ordinary person looking at him could tell that he desperately needed medical attention. Dr. Kellogg testified that Davontae was restrained and kept from accessing food for months and that he was intentionally starved.

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact

could have found, beyond a reasonable doubt, that Coleman intentionally caused Davontae's death through starvation.[25] Further, the evidence is not so weak that the jury's determination is clearly wrong or manifestly unjust. Nor is the jury's determination that Coleman intentionally caused Davontae's death against the great weight and preponderance of the evidence. Because the evidence that Coleman caused Davontae's death is both legally and factually sufficient, points of error seven and eight are overruled.

## Indictment

In point of error six, Coleman alleges that the indictment is fundamentally defective and deprived her of due process because it failed to allege aggravating factors that were later submitted to the jury as special issues. Coleman also argues that the grand jury was required to allege the specific facts legally essential to her death sentence, including facts supporting a negative response to the mitigation special issue. Coleman argues that because these factors were not included in the indictment, the indictment failed to provide notice of the State's intent to seek the death penalty. We have previously addressed these complaints and determined that the State is not required to allege the special issues in the indictment.[26] Coleman offers no reason for us to reconsider our prior determinations at this time. Point of error six is therefore overruled.

## Double Jeopardy

---

[25] T EX. PENAL CODE ANN. § 19.03(a)(2).

[26] *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003).

In her first point of error, Coleman contends that her federal and state constitutional protections against double jeopardy were violated.[27] She argues that, based on the facts and circumstances of this case, serious bodily injury to a child is a lesser-included offense of capital murder.[28]

This claim is not properly before us on this appeal. Because the remedy for any double jeopardy violation in this instance is to set aside the injury-to-a-child conviction and sentence,[29] we conclude that Coleman's claim does not constitute a challenge to her capital murder conviction and death sentence. This claim would be properly before the court of appeals on direct appeal from her injury-to-a-child conviction.[30] We therefore dismiss Coleman's first point of error.

## Admissibility of CPS Statements

In point of error nine, Coleman alleges that the trial judge abused his discretion in admitting statements she made to CPS investigators while she was in custody. Coleman contends that the investigators were state agents and therefore required to warn her in compliance with *Miranda v. Arizona*[31] and Article 38.22 of the Texas Code of Criminal

---

[27] U.S. CONST. amend. V; TEX. CONST. art. I, § 14.

[28] TEX. CODE CRIM. PROC. ANN. art. 37.09(1).

[29] *Bigon v. State*, 252 S.W.3d 360, 373 (Tex. Crim. App. 2008).

[30] *See Callins*, 726 S.W.2d at 558.

[31] 384 U.S. 436 (1966).

Procedure.

The procedural safeguards of *Miranda* and Article 38.22 apply to custodial interrogation by law enforcement officers or their agents.[32] State employment does not, by itself, make a person a state agent for purposes of defining custodial interrogation.[33] Different types of state employees serve different roles.[34] It is law enforcement's job to ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible prosecution.[35] CPS workers have a different duty—to protect the welfare and safety of children in the community.[36] Police officers and CPS workers generally run on separate, yet parallel paths.[37]

> While police are collecting information for an arrest and criminal investigation, CPS workers are investigating to find safe housing and protection for abused or neglected children. When a state-agency employee is working on a path parallel to, yet separate from, the police, *Miranda* warnings are not required.

> On the other hand, if the once-parallel paths of CPS and the police converge, and police and state agents are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be

---

[32] *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005).

[33] *Id*. at 528.

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*. at 529.

necessary.[38]

Courts must examine the entire record to determine if the paths of CPS and the police are parallel or if they have converged in a particular case.[39] Central to this evaluation are the actions and perceptions of the police, the CPS worker, and the defendant.[40] The essential inquiry is whether the custodial interview was conducted explicitly or implicitly on behalf of the police for the purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee.[41]

Jennifer Deible testified that she was a CPS investigator based in Fort Worth. Deible first spoke with Coleman on July 27, 2004, to inform Coleman that her son Dontrell had been taken into custody and to obtain Coleman's signature on a notice of emergency removal. CPS was tasked with placing Dontrell in an appropriate environment, and Deible told Coleman that she would return later to speak with her again.

On August 3, 2004, after receiving Williams's and Coleman's statements to police, the crime-scene report, and photographs of the crime scene, Deible spoke with Coleman while she was being held in the county jail. CPS investigator Edna Campbell accompanied her. Deible testified that, although the written narrative of the visit did not indicate it, she

---

[38] *Id*.

[39] *Id*. at 530.

[40] *Id*.

[41] *Id*. at 531.

provided Coleman the opportunity to decline to speak with her. According to Deible, Coleman said that she was expecting Deible to return. Deible testified that Coleman still wanted to speak with her, though Coleman was aware that she was entitled to have counsel present for the interview and that she was not required to speak with CPS investigators.

At the time of the interview, which lasted approximately two and a half hours, Coleman's son and Williams's other children had already been placed in state custody. Additionally, CPS investigators had already conducted interviews with family members. However, Deible explained that it was necessary to gather an updated social history from Coleman, as well as to find out "who had knowledge of what had been going on with Davontae" and done nothing to help the child.

Edna Campbell testified that, at the time of Davontae's death, she was an investigator for CPS in the Fort Worth area. Campbell testified that the CPS investigators had determined that while Coleman had legal custody of her son Dontrell, he lived with Coleman's mother and that Coleman never stayed at her mother's home. Campbell testified that, even though the investigators gave police a copy of their report as a courtesy, the investigators did not discuss strategy with the police and were never asked to question Coleman. Campbell reiterated that although police reports were available to the CPS investigators, they had an obligation to interview Coleman as part of their own investigation.

When ruling against Coleman on her suppression motion, the trial judge stated:

> The Court has heard the testimony and finds that the Defense has failed
> to show that Ms. Deible and Ms. Campbell were agents for law enforcement

in this situation.

The court finds that Ms. Deible and Ms. Campbell were carrying out their statutory duties as case workers for Child Protective Services when they went to the Tarrant County Jail to speak with the Defendant, Ms. Coleman. Those duties concern the custody, safety and placement of the children who had been taken by CPS in the best interest of the children.

The Court finds that the aims and goals and results sought by CPS were different from law enforcement agents. The Court finds only minimal contact between CPS workers and the police in this case, and that the CPS workers, Deible and Campbell, went to speak with the Defendant, Ms. Coleman, at the Tarrant County Jail independent of police.

While CPS workers had a copy of the statement given to police by Ms. Coleman and a copy of the police reports, the Court finds that they were not under the direction of the police.

. . .

It is clear from the evidence that the CPS workers were not acting at the direction of the police. There was no strategy discussed. The police did not know when the workers were to talk to the Defendant. The police did not arrange the meeting. The police did not provide the questions to be asked. The police did not give instructions to get certain information from the Defendant.

There is no calculated practice between the police and the CPS workers to invoke an incriminating response from the Defendant, and the police were not using the CPS interview to accomplish what the police did not already have lawfully accomplished themselves.

. . .

The CPS investigators' reasons for the interview were different from the police, their aim and goal concerning the children. The police were concerned with gathering information and evidence for a criminal prosecution. There are different goals involved. The agencies were not working together or in tandem. The paths of the investigation did not converge. In fact, they went in different directions.

Giving deference to the trial judge's credibility determinations, we conclude that the evidence shows that Deible and Campbell were not agents of law enforcement who were required to comply with *Miranda* and Article 38.22. Their purpose was to determine if Coleman's son Dontrell could be placed with family members rather than in foster care.

Because family placement was being considered, CPS needed to determine whether Coleman's relatives knew about Coleman's abuse of Davontae. Both Deible and Campbell denied having a law-enforcement purpose or acting at the direction of the police. And there is nothing to indicate that the police used Deible and Campbell to gather evidence against Coleman. As a result, we cannot say that the trial judge abused his discretion in admitting Coleman's statements to CPS. Point of error nine is overruled.

In her tenth point of error, Coleman complains that her constitutional rights under the Fourth, Fifth, and Sixth Amendments were violated when Deible and Campbell were allowed to testify concerning evidence obtained in violation of Article 700.507 of the Texas Administrative Code and the CPS policy handbook. Article 700.507 requires that if a suspect in a child abuse case is in police custody, the investigating CPS worker "must obtain authorization from the investigating police officer before conducting the interview to ensure that the alleged perpetrator's rights under criminal law are protected."

During a pretrial hearing, Deible testified that she notified Sergeant Mark Simpson on July 27, 2004, that she would be going back to interview Coleman. According to Deible, Simpson "said that would be fine." Campbell also testified that Simpson had been informed and did not tell the CPS investigators not to interview Coleman. Coleman argues that Deible and Campbell failed to safeguard Coleman's constitutional rights. Both investigators testified that they followed normal procedures. Coleman provides no authority to support her contention that the procedures followed by the CPS investigators violated her constitutional

rights. Point of error ten is overruled.

**Party Instructions**

In point of error five, Coleman complains that the trial judge erred in instructing the jury that she could be convicted as a party to the offense although she was indicted only as a principal. Texas law does not require that an individual be indicted as a party; if the evidence supports a charge on the law of parties, the trial judge may include an instruction on the law of parties despite the lack of such an allegation in the indictment.[42] Point of error five is overruled.

In her thirteenth point of error, Coleman alleges that the trial judge erred by authorizing the jury to find her guilty of capital murder as a party because the party-application paragraphs did not require jurors to find that Coleman had done anything more than assist Williams in the underlying kidnapping. The jury charge contains three paragraphs authorizing Coleman's conviction as a principal. After each of these paragraphs, the jury was authorized to convict Coleman under the law of parties:

> Or, if you find from the evidence beyond a reasonable doubt that on or about the 26th day of July, 2004, in Tarrant County, Texas, Marcella Williams did then and there intentionally cause the death of an individual, Davontae Williams by [manner and means varied by application paragraph] and the said Marcella Williams was then and there in the course of committing or attempting to commit the offense of kidnapping and the Defendant, Lisa Ann Coleman, acting with intent to promote or assist the commission of the offense encouraged, directed, aided or attempted to aid Marcella Williams in the commission of said offense.

---

[42] *Marable v. State*, 85 S.W.3d 287, 287-88 (Tex. Crim. App. 2002).

Though the paragraphs could have been written more clearly, they are not erroneous. The application paragraphs create ambiguity only when they are read in isolation. However, we do not review charge complaints in this manner. "When we review a charge for alleged error, we must examine the charge as a whole instead of a series of isolated and unrelated statements."[43] A common-sense and practical reading of the application paragraphs in light of the preceding abstract portions of the charge defining capital murder and the law of parties leads us to conclude that the party-application paragraphs were not defective.[44]

The abstract portion of the charge correctly defined capital murder as follows: "A person commits the offense of capital murder if he commits murder as defined above and he intentionally commits the murder in the course of committing or attempting to commit the offense of kidnapping." This definition directed jurors to render a finding on both requisite elements of capital murder—intentional murder and the underlying offense of kidnapping. The preceding abstract portion of the charge also correctly defined the law of parties, and the definition applied only to the capital murder charge:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is

---

[43] *Dinkins v. State*, 894 S.W.2d 330, 340 (Tex. Crim. App. 1995) (citing *Holley v. State*, 766 S.W.2d 254, 256-57 (Tex. Crim. App. 1989); *Inman v. State*, 650 S.W.2d 417, 419 (Tex. Crim. App. 1983)).

[44] *See Dinkins*, 894 S.W.2d at 339-40 (held that the application paragraph that failed to allege the culpable mental state for the second murder was not erroneous because the abstract portion of the charge defined murder, which included the culpable mental state).

criminally responsible, or both. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.[45]

The word "offense" throughout this definition refers to capital murder. So when the law -of-parties definition is read in conjunction with the definition of capital murder, it is clear that a finding on both murder and kidnapping was required.

With this in mind, we turn to the party-application paragraphs. The phrase "the offense" referred to the phrase "said offense" appearing at the end of the paragraphs, and the phrase "said offense" referred to capital murder—murder plus kidnapping. A reading of the charge in its entirety resolved any potential ambiguity in the party-instruction application paragraphs. We presume that the jury followed the instructions in their entirety; therefore, we conclude that the complained-of instructions were not erroneous.

## Parole Instruction

In point of error twelve, Coleman contends the trial judge violated her due-process rights by refusing to give the requested "complete" instruction on parole eligibility during the punishment phase. Coleman argues that, because the instruction given may have erroneously led the jury to believe she could be released before serving a minimum of forty years, the jury was not adequately instructed and her due process-rights were violated.

At trial, Coleman sought to instruct the jury that:

---

[45] TEX. PENAL CODE. ANN. § 7.02(a)(2).

Once [Coleman] becomes eligible for parole, the Board of Pardons and Paroles may not authorize her release to parole unless every board member receives a written report from the Department of Criminal Justice on the probability that [Coleman] would commit an offense after being released on parole, and at least two thirds of the membership votes to release her to parole.

Her request was denied, and the jury was instructed according to Article 37.071, Section 2(e)(2)(B):

You are instructed that, under the law applicable in this case, if the defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison authorities, but eligibility for parole does not guarantee that parole will be granted.

We have held that parole is not a proper matter for jury consideration and that a trial judge does not abuse his or her discretion by refusing to allow voir-dire inquiries regarding parole.[46] However, Article 37.071 now provides that a jury may be instructed on a capital defendant's eligibility for parole.[47] But this provision is narrowly drawn and does not render every aspect of parole law an issue for jury consideration.[48] The provision expressly discourages speculation about the parole process by providing that application of the parole

---

[46] *Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000); *see also Hankins v. State*, 132 S.W.3d 380, 384 (Tex. Crim. App. 2004).

[47] *Hankins*, 132 S.W.3d at 385.

[48] *Id*.

laws cannot be accurately predicted "because the application of those laws will depend on decisions made by prison and parole authorities."[49] The 1999 amendments could have been drafted more broadly to give jurors more information, but the Legislature chose not to do so.[50] Accordingly, the trial judge did not err in denying Coleman's requested instruction. Point of error twelve is overruled.

### Future Dangerousness

In point of error fifteen, Coleman challenges the legal sufficiency of the evidence supporting the jury's determination regarding the future-dangerousness issue. A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[51] We must view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes."[52]

CPS records show that Coleman was involved with the Williams family as early as 1995. In 1999, Coleman was the subject of a CPS abuse case involving Davontae. Davontae was removed from the home at that time because he was being abused by Coleman and his

---

[49] *Id.*

[50] *Id.*

[51] *Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *see also Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[52] *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

mother failed to protect him from the abuse. Davontae was returned to the family home only when Williams agreed not to let Coleman live in the home and CPS caseworkers were certain that Coleman was not living in the home. CPS records indicated, however, that at the time of Davontae's death, Coleman lived in the home more than fifty percent of the time and was considered by CPS as a care giver.

Coleman admitted to CPS investigators that she had pushed and hit Davontae, causing him to fall and split his lip, but she insisted that she had not beaten Davontae since February 2004. Coleman's own mother had told Coleman to leave Davontae alone, and her sister had advised her to get help for Davontae. Coleman also admitted to tying up Davontae with clothing at least twice, but insisted that it was for his own protection because he wandered at night. Davontae's sister, Destinee, told the jury that Coleman kept Davontae tied up in the bathroom and whipped him with extension cords. Destinee also told the jury that Coleman beat her and her sister with belts, clothes hangers, and extension cords as well.

Dr. Kellogg identified 250 distinct injuries suffered by Davontae, including cigar or cigarette burns and ligature marks on his arms and legs, many of which were old enough to have formed scars. Dr. Konzelmann testified about a significant injury to Davontae's lip that would have, before it healed, made it difficult for him to eat and nearly impossible to drink. Davontae also had a deformity to one of his ears that was caused by long-term traumatic injury and ligature scarring on his penis caused by attempts to prevent Davontae from wetting his bed.

And as shown above, there was ample evidence of intentional starvation. Davontae had been healthy and growing in 1999; his starvation was not based on metabolic factors. The presence of depleted fat cells showed that he had received adequate nutrition at some time. Dr. Kellogg testified that there was no food matter in Davontae's system beyond his stomach, indicating that he had not eaten regularly. The jury heard from Dr. Kellogg that Davontae's death occurred over a number of months.

The jury also heard from Carol Bowdry, Coleman's own expert, that Davontae's injuries were torturous. Bowdry agreed on cross-examination that Coleman systematically and chronically abused Davontae. She testified that Davontae "went through agony." Bowdry also testified that abusers such as Coleman "may intend for the child to go through an awful lot of pain and suffering," but are surprised when a child dies from the abuse. Coleman's second expert, Dr. Mary Connell, testified on cross-examination that even someone like Coleman who suffered abuse as a child would know that the systematic abuse of Davontae was wrong.

The State presented evidence of Coleman's prior felony convictions for burglary of a habitation and possession of a controlled substance. On cross-examination, defense expert Dr. Paula Lundberg-Love admitted that Coleman had revealed to her a conviction for unlawfully carrying a weapon when she was seventeen in 1993, an arrest for evading arrest in 1995, and a parole violation in 1997 that resulted in her return to prison.

A rational jury could determine from this evidence that, beyond a reasonable doubt,

there was a probability that appellant would commit criminal acts of violence in the future so as to constitute a continuing threat to society. Point of error fifteen is overruled.

## Mitigation Special Issue

In point of error sixteen, Coleman argues that the evidence is insufficient to show an absence of mitigation to support the jury's negative finding on the mitigation special issue. We have said, however, that we will not review the jury's finding regarding the mitigation special issue for sufficiency of the evidence because the determination as to whether mitigating evidence calls for a life sentence is left to the discretion of the jury.[53] Point of error sixteen is overruled.

## Definitions

In point of error eleven, Coleman alleges that the mitigation special issue was unconstitutionally vague and indefinite in violation of the Fourteenth Amendment and the Texas Constitution for failing to provide a definition of "mitigating evidence." In point of error nineteen, Coleman alleges the trial judge deprived her of her rights to due process and the protection against cruel and unusual punishment by rejecting her request that the jury be instructed on the definitions of "criminal acts of violence" and "probability." We have previously held that a trial judge need not define the terms used in the special issues because

---

[53] *Green v. State*, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); *Colella v. State*, 915 S.W.2d 834, 895 (Tex. Crim. App. 1995).

the jury is presumed to understand them without instruction.[54] Points of error eleven and nineteen are overruled.

## Constitutionality of Death-Penalty Scheme

In her fourteenth point of error, Coleman complains that the Texas death-penalty scheme is unconstitutional because the State is not required to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt. We have addressed and rejected this and similar arguments in the past.[55] Point of error fourteen is overruled.

In point of error seventeen, Coleman complains that she was deprived of due process under the Fifth, Eighth, and Fourteenth Amendments because the State has unfettered discretion in seeking the death penalty. We have previously addressed and rejected this complaint.[56] Point of error seventeen is overruled.

In point of error eighteen, Coleman complains that she was deprived of her rights to due process and the protection against cruel and unusual punishment because the jury was instructed that at least ten "no" votes were required to return a negative answer to the mitigation special issue. Coleman also complains that jurors were not instructed regarding

---

[54] *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994); *Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994).

[55] *Perry v. State*, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Blue*, 125 S.W.3d at 500-01.

[56] *Perry*, 158 S.W.3d at 446-47; *Blue*, 125 S.W.3d at 500-01.

the consequences of their deliberations. We have previously addressed these issues and find no reason to do so again. Point of error eighteen is overruled.[57]

In point of error twenty, Coleman challenges the constitutionality of Article 37.071 Section 2(b)(1) of the Texas Code of Criminal Procedure. Coleman argues that Article 37.071 diminishes the State's burden of proof because it allows the jury to answer the future-dangerousness special issue "yes" based on a probability standard, rather than a beyond a reasonable doubt standard. We have previously rejected this and similar arguments.[58] Point of error twenty is overruled.

### Execution Protocol

In point of error twenty-one, Coleman alleges that the use of pancuronium bromide in the chemical mixture used to execute prisoners in Texas violates the prohibition against cruel and unusual punishment. Coleman's execution is not imminent. The method by which the lethal injection is currently administered is not determinative of the way it will be administered at the time of her execution.[59] Thus, her claim is not ripe for review.[60] Point of error twenty-one is overruled.

---

[57] *Prystash v. State*, 3 S.W.3d 522, 536 (1999); *McFarland v. State*, 928 S.W.2d 482, 519 (1996); *Lawton v. State*, 913 S.W.2d 542, 558-59 (1995).

[58] *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994); *see also Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003); *Kemp v. State*, 846 S.W.2d 289, 308-09 (Tex. Crim. App. 1992).

[59] *Gallo v. State*, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007).

[60] *Id.*

**Conclusion**

Based on the foregoing, we affirm the judgment of the trial court as to Count One.

We also dismiss Coleman's claims challenging her conviction under Count Two.


DELIVERED: December 9, 2009
DO NOT PUBLISH