IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-75,478





LISA ANN COLEMAN, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 1016470R


IN THE 297TH JUDICIAL DISTRICT COURT


TARRANT COUNTY






 Per Curiam. Price and Womack, JJ., concurred.


O P I N I O N



 Lisa Ann Coleman was charged with capital murder and with two counts of injury to
a child committed in July 2004. Count Three, injury to a child, was severed on April 18,
2006. On June 19, 2006, a jury convicted Coleman of capital murder in Count One. (1) Based
on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Coleman to death for Count
One only. (2) For Count One, direct appeal to this Court is automatic. (3) After reviewing
Coleman's points of error relating to her capital murder conviction and death sentence, we
find them to be without merit. Accordingly, we affirm Coleman's conviction and death
sentence for Count One. 

 The jury also convicted Coleman of injury to a child in Count Two and assessed a
ninety-nine year sentence. Coleman's points of error challenging this conviction and
sentence are not before us. (4) Therefore, we dismiss those claims. 

I. Sufficiency of the Evidence

A. Facts

 On July 26, 2004, Marcella Williams, Coleman's lover, found her nine-year-old son
Davontae unconscious and called 911. While en route to Williams's apartment, firefighter
and paramedic Troy Brooks stated that the dispatcher changed the call from "breathing
difficulty" to "full arrest." When he arrived, Davontae was lying on the bathroom floor clad
in a disposable diaper. Brooks testified that Davontae appeared "emaciated" and looked as
if he was only three to five years old. Brooks immediately realized that Davontae was dead;
his body was already in full rigor mortis, which usually occurs several hours after death. 
This "shock[ed]" Brooks because Williams had told him that Davontae had just eaten and
thrown up and that Williams and Coleman had been washing him. Brooks also noticed that
Davontae had a few "dirty bandages" on his arms. Vanessa Sheriff, a paramedic, testified
that Williams told her that she tried to feed Davontae Pediasure. Williams also said that
Davontae was breathing when she called 911. Sheriff believed this statement "did not match
with what [she saw] on the bathroom floor." Both Brooks and Sheriff noticed that Davontae
had traces of yellow vomit or bile around his mouth and nose. Sheriff believed that the
appearance of vomit was consistent with the liquid Pediasure. 

 Dr. Daniel Konzelmann conducted the autopsy. Dr. Konzelmann determined that
Davontae's death was a homicide and that the direct cause of death was malnutrition coupled
with slight pneumonia. Davontae weighed less than forty pounds at the time of his death. 
Dr. Konzelmann determined that Davontae was malnourished because Davontae's body
lacked subcutaneous fat cells. He also cited the lack of fat cells surrounding Davontae's
heart as very unusual. Dr. Konzelmann also explained how the external injuries to
Davontae's body contributed to his death:

 I believe that some of these injuries were infected and that it's possible that
this did relate to the pneumonia that he had. Also some of these were evidence
to me that he had been bound and that this would have prevented him from
either seeking care on his own or getting food on his own.

. . .

 Malnutrition will depress the immune system. That is, there are cells in the
body that are designed to recognize invaders and deal with them, and that takes
energy. As someone becomes more malnourished, their system is less able to
protect themselves. 


 Dr. Konzelmann noted evidence indicating that Davontae had been continuously
bound. Davontae had numerous linear marks on his wrists. Some of the marks were scarred,
indicating wounds that had healed, and some of the marks were "giant sores[s]," indicating
that they were not healing. This demonstrated a pattern of restraint. Davontae's ankles had
similar markings. Davontae's ear had a significant wound that was beginning to heal. His
lower lip had an ulceration and a tear that would make it hard for Davontae to eat and drink. 
It appeared that Davontae had chicken-noodle soup before he died but, according to Dr.
Konzelmann, "it was inadequate, too late, and possibly too much."

 Dr. Nancy Kellogg, a board-certified pediatrician and specialist in child abuse,
identified at least 250 distinct injuries to Davontae, including cigarette or cigar burn wounds
and numerous ligature marks on his arms and legs. Kellogg described the starvation of a
child as "very rare" and "unusual." However, based on the ligature marks, she concluded
that Davontae was intentionally starved to death. Davontae had been restrained from
accessing food. Based on a review of Davontae's medical records from December 2002, Dr.
Kellogg opined that Davontae had a "normal growth velocity" for a child his age. This
indicated that he did not suffer from a disease that would stunt his growth. In the months
before his death, however, Davontae's weight spiked downward and he stopped growing.
The physical stress caused Davontae's hair growth to be abnormal; he had hair growing in
places where hair does not normally grow. Such growth is typically seen in people who are
anorexic. 

 Detective Jim Ford questioned Coleman while investigating Davontae's death. 
Coleman told Detective Ford that she lived with Williams about half of the time and with her
son and mother the other half. She used to beat Davontae with a belt but stopped in February
or March of 2004 because the beatings left welts. She stated that she and Williams tied up
Davontae on several occasions. Recalling the night that Davontae died, Coleman stated that
Williams woke her up screaming. Williams attempted to administer CPR to Davontae, and
Coleman said that she put Davontae in a warm bath to revive him. Coleman did not know
how Davontae injured his arms and legs.

 Davontae's sister, Destinee, who was eight at the time, testified that Coleman would
tie Davontae up with an extension cord in the bathroom. When Davontae was tied up, he
"couldn't move around much" and did "[n]othing." 

 Child Protective Service (CPS) Investigators Jennifer Deible and Edna Campbell
testified that Davontae was removed from Williams's home and placed in foster care in 1999
because Coleman physically abused him. Davontae was returned to Williams's custody 
about a year later. After her arrest in this case, Coleman told the two that she bruised
Davontae by beating him with a belt in 2004. She spoke to her mother about the incident,
and her mother told her to not to touch Davontae. She admitted that she tied up Davontae
on two occasions with clothing to keep him from hurting himself or others. According to
Campbell, Coleman said that Williams did not want to take Davontae to the doctor because
she was afraid that the bruises and marks would prompt a doctor to call CPS. Coleman
admitted to Campbell that she had hit and pushed Davontae, causing him to split his lip. She
also told Campbell that Williams did not want Davontae to go to school because Williams
was afraid that he would report the abuse and that school officials would call CPS. Coleman
stated that Davontae had been tied up regularly since June and that the sore on his arm was
caused by him fighting to be released. The pantry door had a lock on the top of the door
frame, and investigators discovered a dry urine stain on the floor. But Coleman denied
locking Davontae in the pantry. Coleman also said that Davontae had been sick for about a
month before his death. He did not eat very much when fed, and he would throw up. 
Coleman stated that, in an attempt to help Davontae, she and Williams gave him a variety of
over-the-counter medicines.

 Dr. Lesther Winkler, a pathologist, testified for the defense. He stated that Davontae
died from aspiration pneumonia, which "is the result of sucking food or particles of material
which don't go into the stomach properly through the esophagus and are sucked instead into
the trachea," which leads to the lungs. Dr. Winkler noted aspirated material in Davontae's
lung and that his right lung was twice the size of his left because of the aspirated material. 
Dr. Winkler disagreed with Dr. Konzelmann's determination that the absence of fat around
Davontae's heart was significant. In his opinion, children rarely have fat around the heart. 
As for the malnutrition, Dr. Winkler agreed that Davontae was malnourished; there was no
evidence that Davontae was unable to metabolize food. 

 Dr. Nizam Peerwani, the Chief Medical Examiner with Tarrant County, also examined
Davontae's body during the autopsy. The State called him to testify to rebut Dr. Winkler's
testimony. He stated that a normal person does not aspirate and die and that there was no
reason to suggest that Davontae aspirated given his medical history. Viewing the "entire
picture," Dr. Peerwani stated, "even if he had aspirated, the pneumonia is not a very
significant component in this child's death. Perhaps the most dramatic component is
malnourishment . . . . He died because of malnutrition." 

B. Analysis

 In points of error two and three, Coleman alleges that the evidence supporting her
conviction for injury to a child is legally and factually insufficient. Coleman also addresses
the jury's findings of guilt for injury to a child as alleged in Count Two. Her conviction and
sentence in Count Two, however, are not before this Court. (5) Points of error two and three
are therefore dismissed.

 In her fourth point of error, Coleman contends that the evidence is legally and
factually insufficient to support the jury's findings that she kidnapped Davontae. Because
Coleman combines more than one legal argument in a single ground, we could reject her
claims on the ground that nothing is presented for review. (6) Nevertheless, we will address
both of her arguments. In points of error seven and eight, Coleman alleges that the evidence
is legally and factually insufficient to show that she intentionally caused Davontae's death.

 Under Jackson v. Virginia, when deciding whether evidence is legally sufficient to
support a conviction, we assess all of the evidence in the light most favorable to the verdict
to determine whether "any rational trier of fact could find the essential elements of the crime
beyond a reasonable doubt." (7) Evidence is factually insufficient when, although legally
sufficient under a Jackson analysis, the evidence is "so weak" that the verdict "seems clearly
wrong or manifestly unjust" or "against the great weight and preponderance of the
evidence." (8) A factual sufficiency review is "barely distinguishable" from a Jackson v.
Virginia legal sufficiency review. (9) 

 1. Kidnapping

 A person commits the offense of kidnapping if she intentionally or knowingly abducts
another person. (10) "Abduct" means to restrain a person with intent to prevent the person's
liberation, and it can be accomplished in two ways: (1) "secreting or holding the person in
a place where the person is not likely to be found;" or (2) "using or threatening to use deadly
force." (11) "Abduct" includes two elements--an actus rea requirement and a mens rea
requirement. (12) Under the actus rea requirement, the defendant must have restrained another
person. (13) And under the mens rea requirement, the defendant must have had the specific
intent to prevent a person's liberation. (14) 

 Secreting or holding another person where the person is unlikely to be found is part
of the mens rea requirement of the offense. (15) Thus, the State is not required to prove that the
defendant actually secreted or held another; (16) it must prove that the defendant restrained the
other person with the specific intent to prevent liberation by secreting or holding the person. (17) 
The offense of kidnapping is legally completed when the defendant, at any time during the
restraint, forms the intent to prevent liberation by secreting or holding another in a place
where the person is unlikely to be found. (18) Intent may be inferred from an accused's conduct, 

 remarks, and the surrounding circumstances. (19) 

 Coleman argues that the evidence shows only that she tied up Davontae for a short
time with clothing and therefore nothing established that the restraint was capable of causing
death or serious bodily injury, or that she intended to cause death or serious bodily injury. 
Additionally, Coleman argues that the evidence presented indicates only that she may have
restrained Davontae for a short time in his own home, which is where one would expect to
find a child. Finally, Coleman argues that it is apparent that Davontae's mother acquiesced
in the restraint. (20)

 First, that Williams may have acquiesced in the restraint is of no consequence. The
record shows that Williams and Coleman acted in concert. But Coleman restrained Davontae
without his consent and did so through the use of force and intimidation. (21) The numerous
ligatures marks themselves are evidence of force. Destinee testified that Coleman used an
extension cord to tie up Davontae in the bathroom. And Coleman admitted that she
physically abused Davontae. Thus, there was evidence that Coleman used force and
intimidation to restrain Davontae. 

 Additionally, that Davontae was restrained in his own home did not preclude the jury
from inferring that Coleman intended to secret or hold Davontae in a place where he was
unlikely to be found. We have recognized that a rational factfinder can infer the intent to
secret or hold a person in a place where that person is unlikely to be found when a defendant
isolates a person from anyone who might be of assistance. (22) 

 Dovantae began first grade in 2002. Williams pulled him out of school in mid-November, before the holidays. Before that, Davontae's teacher, Jean Ann Stokes, noticed
that Davontae had a difficult time adapting to the classroom. He did not take non-verbal cues
from Stokes or his classmates. Stokes and the cafeteria staff noticed that Davontae was
always hungry. The cafeteria staff would usually find extra food to give him. Stokes also
noticed that Davontae had some "markings" on his body that concerned her. She and the
school's counselor reported all of this to CPS. Davontae spoke to a man from CPS on the
phone, but Stokes could not hear what he asked Davontae. In November, Stokes developed
a plan for Davontae to take part in an alternative program so he could learn how school
works. Before the plan could be implemented, Davontae disappeared from school and never
returned. 

 Coleman told CPS investigators that Williams did not want Davontae to go to school
or to a doctor because she was afraid that Davontae would report the abuse and someone
would call CPS. Coleman did not defy Williams, and the record indicates that the two acted
in concert. Destinee testified that Davontae was tied up in the bathroom. Also, according
Coleman's own statement, Davontae had been restrained inside the home since June 2004. 
Further, a reasonable jury could have inferred that the restraint began earlier. Malnutrition,
according to the State's experts, occurs over an extended period of time. 

 Finally, Coleman told CPS investigators that anyone who inquired into Davontae's
whereabouts was informed that he was "with his mother's people," even though Davontae
was at home. Coleman's statement was supported by testimony from Williams's sister. 
Latravier Williams testified that Coleman and Williams came to her house with Williams's
daughters, and when she asked where Davontae was, both Coleman and Williams told her
that he was with another family member. 

 Ordinarily, it would seem counterintuitive to believe that a child, located in the home,
has been secreted or held in a place where the child is not likely to be found. But when the
evidence shows, as it does in this case, that the perpetrator makes a concerted effort to
prevent outsiders and even family members from looking for the child at home so as to deny
access to the child, the evidence suffices to establish the perpetrator's intention to make the
home a place where the child is not likely to be found. (23) Here, the evidence shows that
Williams and Coleman took several deliberate measures to deflect outsiders interested in
Davontae from looking for him at home and having access to him. (24) The facts and
circumstances of this unusual case make it comparable to a situation in which a perpetrator
confines a child in a hidden compartment inside the child's own home. Such a circumstance
would be more than sufficient to prove, beyond a reasonable doubt, the requisite intent to
secret or hold the child in place where the child is unlikely to be found. 

 When the evidence is viewed in the light most favorable to the verdict, a rational trier
of fact could have found that Davontae was kidnapped. Further, the evidence is not so weak
that the jury's determination is clearly wrong and manifestly unjust. Nor is the jury's
determination that Davontae was kidnapped against the great weight and preponderance of
the evidence. Because the evidence of kidnapping is both legally and factually sufficient, we
overrule Coleman's fourth point of error. 

 2. Cause of Death

 Coleman argues that the evidence is legally and factually insufficient to show that she
intentionally caused Davontae's death. While the State and defense presented competing
expert opinions about the cause of Davontae's death, the jury could have inferred from the
evidence that Davontae's death was caused by malnutrition rather than aspiration pneumonia. 
The jury was presented with evidence of intentional starvation. Davontae had been healthy
and growing in 1999, and his starvation was not based on metabolic factors. Dr. Kellogg
testified that there was no food matter in Davontae's system beyond his stomach. This
showed that he had not eaten regularly. Dr. Kellogg and Dr. Peerwani concluded that
Davontae was malnourished and that an ordinary person looking at him could tell that he
desperately needed medical attention. Dr. Kellogg testified that Davontae was restrained and
kept from accessing food for months and that he was intentionally starved.

 Viewing the evidence in the light most favorable to the verdict, a rational trier of fact
could have found, beyond a reasonable doubt, that Coleman intentionally caused Davontae's
death through starvation. (25) Further, the evidence is not so weak that the jury's determination
is clearly wrong or manifestly unjust. Nor is the jury's determination that Coleman
intentionally caused Davontae's death against the great weight and preponderance of the
evidence. Because the evidence that Coleman caused Davontae's death is both legally and
factually sufficient, points of error seven and eight are overruled.

Indictment

 In point of error six, Coleman alleges that the indictment is fundamentally defective
and deprived her of due process because it failed to allege aggravating factors that were later
submitted to the jury as special issues. Coleman also argues that the grand jury was required
to allege the specific facts legally essential to her death sentence, including facts supporting
a negative response to the mitigation special issue. Coleman argues that because these
factors were not included in the indictment, the indictment failed to provide notice of the
State's intent to seek the death penalty. We have previously addressed these complaints and
determined that the State is not required to allege the special issues in the indictment. (26) 
Coleman offers no reason for us to reconsider our prior determinations at this time. Point of
error six is therefore overruled.

Double Jeopardy

 In her first point of error, Coleman contends that her federal and state constitutional
protections against double jeopardy were violated. (27) She argues that, based on the facts and
circumstances of this case, serious bodily injury to a child is a lesser-included offense of
capital murder. (28)

 This claim is not properly before us on this appeal. Because the remedy for any
double jeopardy violation in this instance is to set aside the injury-to-a-child conviction and
sentence, (29) we conclude that Coleman's claim does not constitute a challenge to her capital
murder conviction and death sentence. This claim would be properly before the court of
appeals on direct appeal from her injury-to-a-child conviction. (30) We therefore dismiss
Coleman's first point of error. 

Admissibility of CPS Statements

 In point of error nine, Coleman alleges that the trial judge abused his discretion in
admitting statements she made to CPS investigators while she was in custody. Coleman
contends that the investigators were state agents and therefore required to warn her in
compliance with Miranda v. Arizona (31) and Article 38.22 of the Texas Code of Criminal
Procedure.

 The procedural safeguards of Miranda and Article 38.22 apply to custodial
interrogation by law enforcement officers or their agents. (32) State employment does not, by
itself, make a person a state agent for purposes of defining custodial interrogation. (33) 
Different types of state employees serve different roles. (34) It is law enforcement's job to ferret
out crime, investigate its commission, arrest the perpetrator, and gather evidence for a
possible prosecution. (35) CPS workers have a different duty--to protect the welfare and safety
of children in the community. (36) Police officers and CPS workers generally run on separate,
yet parallel paths. (37)

 While police are collecting information for an arrest and criminal
investigation, CPS workers are investigating to find safe housing and
protection for abused or neglected children. When a state-agency employee
is working on a path parallel to, yet separate from, the police, Miranda
warnings are not required.


 On the other hand, if the once-parallel paths of CPS and the police
converge, and police and state agents are investigating a criminal offense in
tandem, Miranda warnings and compliance with article 38.22 may be
necessary. (38)


 Courts must examine the entire record to determine if the paths of CPS and the police
are parallel or if they have converged in a particular case. (39) Central to this evaluation are the
actions and perceptions of the police, the CPS worker, and the defendant. (40) The essential
inquiry is whether the custodial interview was conducted explicitly or implicitly on behalf
of the police for the purpose of gathering evidence or statements to be used in a later criminal
proceeding against the interviewee. (41)

 Jennifer Deible testified that she was a CPS investigator based in Fort Worth. Deible
first spoke with Coleman on July 27, 2004, to inform Coleman that her son Dontrell had been
taken into custody and to obtain Coleman's signature on a notice of emergency removal. 
CPS was tasked with placing Dontrell in an appropriate environment, and Deible told
Coleman that she would return later to speak with her again.

 On August 3, 2004, after receiving Williams's and Coleman's statements to police,
the crime-scene report, and photographs of the crime scene, Deible spoke with Coleman
while she was being held in the county jail. CPS investigator Edna Campbell accompanied
her. Deible testified that, although the written narrative of the visit did not indicate it, she
provided Coleman the opportunity to decline to speak with her. According to Deible,
Coleman said that she was expecting Deible to return. Deible testified that Coleman still
wanted to speak with her, though Coleman was aware that she was entitled to have counsel
present for the interview and that she was not required to speak with CPS investigators.

 At the time of the interview, which lasted approximately two and a half hours,
Coleman's son and Williams's other children had already been placed in state custody. 
Additionally, CPS investigators had already conducted interviews with family members. 
However, Deible explained that it was necessary to gather an updated social history from
Coleman, as well as to find out "who had knowledge of what had been going on with
Davontae" and done nothing to help the child.

 Edna Campbell testified that, at the time of Davontae's death, she was an investigator
for CPS in the Fort Worth area. Campbell testified that the CPS investigators had determined
that while Coleman had legal custody of her son Dontrell, he lived with Coleman's mother
and that Coleman never stayed at her mother's home. Campbell testified that, even though
the investigators gave police a copy of their report as a courtesy, the investigators did not
discuss strategy with the police and were never asked to question Coleman. Campbell
reiterated that although police reports were available to the CPS investigators, they had an
obligation to interview Coleman as part of their own investigation.

 When ruling against Coleman on her suppression motion, the trial judge stated:

 The Court has heard the testimony and finds that the Defense has failed
to show that Ms. Deible and Ms. Campbell were agents for law enforcement
in this situation. 

 The court finds that Ms. Deible and Ms. Campbell were carrying out
their statutory duties as case workers for Child Protective Services when they
went to the Tarrant County Jail to speak with the Defendant, Ms. Coleman. 
Those duties concern the custody, safety and placement of the children who
had been taken by CPS in the best interest of the children.

 The Court finds that the aims and goals and results sought by CPS were
different from law enforcement agents. The Court finds only minimal contact
between CPS workers and the police in this case, and that the CPS workers,
Deible and Campbell, went to speak with the Defendant, Ms. Coleman, at the
Tarrant County Jail independent of police.

 While CPS workers had a copy of the statement given to police by Ms.
Coleman and a copy of the police reports, the Court finds that they were not
under the direction of the police.

 . . . 

 It is clear from the evidence that the CPS workers were not acting at the
direction of the police. There was no strategy discussed. The police did not
know when the workers were to talk to the Defendant. The police did not
arrange the meeting. The police did not provide the questions to be asked. 
The police did not give instructions to get certain information from the
Defendant. 

 There is no calculated practice between the police and the CPS workers
to invoke an incriminating response from the Defendant, and the police were
not using the CPS interview to accomplish what the police did not already
have lawfully accomplished themselves.

. . . 

 The CPS investigators' reasons for the interview were different from
the police, their aim and goal concerning the children. The police were
concerned with gathering information and evidence for a criminal prosecution. 
There are different goals involved. The agencies were not working together
or in tandem. The paths of the investigation did not converge. In fact, they
went in different directions. 


 Giving deference to the trial judge's credibility determinations, we conclude that the
evidence shows that Deible and Campbell were not agents of law enforcement who were
required to comply with Miranda and Article 38.22. Their purpose was to determine if
Coleman's son Dontrell could be placed with family members rather than in foster care. 
Because family placement was being considered, CPS needed to determine whether
Coleman's relatives knew about Coleman's abuse of Davontae. Both Deible and Campbell
denied having a law-enforcement purpose or acting at the direction of the police. And there
is nothing to indicate that the police used Deible and Campbell to gather evidence against
Coleman. As a result, we cannot say that the trial judge abused his discretion in admitting
Coleman's statements to CPS. Point of error nine is overruled.

 In her tenth point of error, Coleman complains that her constitutional rights under the
Fourth, Fifth, and Sixth Amendments were violated when Deible and Campbell were allowed
to testify concerning evidence obtained in violation of Article 700.507 of the Texas
Administrative Code and the CPS policy handbook. Article 700.507 requires that if a suspect
in a child abuse case is in police custody, the investigating CPS worker "must obtain
authorization from the investigating police officer before conducting the interview to ensure
that the alleged perpetrator's rights under criminal law are protected."

 During a pretrial hearing, Deible testified that she notified Sergeant Mark Simpson
on July 27, 2004, that she would be going back to interview Coleman. According to Deible,
Simpson "said that would be fine." Campbell also testified that Simpson had been informed
and did not tell the CPS investigators not to interview Coleman. Coleman argues that Deible
and Campbell failed to safeguard Coleman's constitutional rights. Both investigators
testified that they followed normal procedures. Coleman provides no authority to support her
contention that the procedures followed by the CPS investigators violated her constitutional
rights. Point of error ten is overruled.

Party Instructions In point of error five, Coleman complains that the trial judge erred in instructing the
jury that she could be convicted as a party to the offense although she was indicted only as
a principal. Texas law does not require that an individual be indicted as a party; if the
evidence supports a charge on the law of parties, the trial judge may include an instruction
on the law of parties despite the lack of such an allegation in the indictment. (42) Point of error
five is overruled.

 In her thirteenth point of error, Coleman alleges that the trial judge erred by
authorizing the jury to find her guilty of capital murder as a party because the party-application paragraphs did not require jurors to find that Coleman had done anything more
than assist Williams in the underlying kidnapping. The jury charge contains three paragraphs
authorizing Coleman's conviction as a principal. After each of these paragraphs, the jury
was authorized to convict Coleman under the law of parties:

 Or, if you find from the evidence beyond a reasonable doubt that on or about
the 26th day of July, 2004, in Tarrant County, Texas, Marcella Williams did
then and there intentionally cause the death of an individual, Davontae
Williams by [manner and means varied by application paragraph] and the said
Marcella Williams was then and there in the course of committing or
attempting to commit the offense of kidnapping and the Defendant, Lisa Ann
Coleman, acting with intent to promote or assist the commission of the offense
encouraged, directed, aided or attempted to aid Marcella Williams in the
commission of said offense.


 Though the paragraphs could have been written more clearly, they are not erroneous. 
The application paragraphs create ambiguity only when they are read in isolation. However,
we do not review charge complaints in this manner. "When we review a charge for alleged
error, we must examine the charge as a whole instead of a series of isolated and unrelated
statements." (43) A common-sense and practical reading of the application paragraphs in light
of the preceding abstract portions of the charge defining capital murder and the law of parties
leads us to conclude that the party-application paragraphs were not defective. (44) 

 The abstract portion of the charge correctly defined capital murder as follows: "A
person commits the offense of capital murder if he commits murder as defined above and he
intentionally commits the murder in the course of committing or attempting to commit the
offense of kidnapping." This definition directed jurors to render a finding on both requisite
elements of capital murder--intentional murder and the underlying offense of kidnapping. 
 The preceding abstract portion of the charge also correctly defined the law of parties, and
the definition applied only to the capital murder charge: 

 A person is criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or both. A person is criminally responsible for an
offense committed by the conduct of another if, acting with intent to promote
or assist the commission of the offense, he solicits, encourages, directs, aids,
or attempts to aid the other person to commit the offense. (45) 


The word "offense" throughout this definition refers to capital murder. So when the law -of-parties definition is read in conjunction with the definition of capital murder, it is clear that
a finding on both murder and kidnapping was required. 

 With this in mind, we turn to the party-application paragraphs. The phrase "the
offense" referred to the phrase "said offense" appearing at the end of the paragraphs, and the
phrase "said offense" referred to capital murder--murder plus kidnapping. A reading of the
charge in its entirety resolved any potential ambiguity in the party-instruction application
paragraphs. We presume that the jury followed the instructions in their entirety; therefore,
we conclude that the complained-of instructions were not erroneous. 

Parole Instruction

 In point of error twelve, Coleman contends the trial judge violated her due-process
rights by refusing to give the requested "complete" instruction on parole eligibility during
the punishment phase. Coleman argues that, because the instruction given may have
erroneously led the jury to believe she could be released before serving a minimum of forty
years, the jury was not adequately instructed and her due process-rights were violated.

 At trial, Coleman sought to instruct the jury that:

 Once [Coleman] becomes eligible for parole, the Board of Pardons and Paroles
may not authorize her release to parole unless every board member receives a
written report from the Department of Criminal Justice on the probability that
[Coleman] would commit an offense after being released on parole, and at
least two thirds of the membership votes to release her to parole.


Her request was denied, and the jury was instructed according to Article 37.071, Section
2(e)(2)(B):

 You are instructed that, under the law applicable in this case, if the defendant
is sentenced to imprisonment in the Institutional Division of the Texas
Department of Criminal Justice for life, the defendant will become eligible for
release on parole, but not until the actual time served by the defendant equals
40 years, without consideration of any good conduct time. It cannot accurately
be predicted how the parole laws might be applied to this defendant if the
defendant is sentenced to a term of imprisonment for life because the
application of those laws will depend on decisions made by prison authorities,
but eligibility for parole does not guarantee that parole will be granted.


 We have held that parole is not a proper matter for jury consideration and that a trial
judge does not abuse his or her discretion by refusing to allow voir-dire inquiries regarding
parole. (46) However, Article 37.071 now provides that a jury may be instructed on a capital
defendant's eligibility for parole. (47) But this provision is narrowly drawn and does not render
every aspect of parole law an issue for jury consideration. (48) The provision expressly
discourages speculation about the parole process by providing that application of the parole
laws cannot be accurately predicted "because the application of those laws will depend on
decisions made by prison and parole authorities." (49) The 1999 amendments could have been
drafted more broadly to give jurors more information, but the Legislature chose not to do
so. (50) Accordingly, the trial judge did not err in denying Coleman's requested instruction. 
Point of error twelve is overruled.

Future Dangerousness

 In point of error fifteen, Coleman challenges the legal sufficiency of the evidence
supporting the jury's determination regarding the future-dangerousness issue. A jury may
consider a variety of factors when determining whether a defendant will pose a continuing
threat to society. (51) We must view all of the evidence in the light most favorable to the jury's
finding and determine whether, based on that evidence and reasonable inferences therefrom,
a rational jury could have found beyond a reasonable doubt that the answer to the future-
dangerousness issue was "yes." (52)

 CPS records show that Coleman was involved with the Williams family as early as
1995. In 1999, Coleman was the subject of a CPS abuse case involving Davontae. Davontae
was removed from the home at that time because he was being abused by Coleman and his
mother failed to protect him from the abuse. Davontae was returned to the family home only
when Williams agreed not to let Coleman live in the home and CPS caseworkers were certain
that Coleman was not living in the home. CPS records indicated, however, that at the time
of Davontae's death, Coleman lived in the home more than fifty percent of the time and was
considered by CPS as a care giver.

 Coleman admitted to CPS investigators that she had pushed and hit Davontae, causing
him to fall and split his lip, but she insisted that she had not beaten Davontae since February
2004. Coleman's own mother had told Coleman to leave Davontae alone, and her sister had
advised her to get help for Davontae. Coleman also admitted to tying up Davontae with
clothing at least twice, but insisted that it was for his own protection because he wandered
at night. Davontae's sister, Destinee, told the jury that Coleman kept Davontae tied up in the
bathroom and whipped him with extension cords. Destinee also told the jury that Coleman
beat her and her sister with belts, clothes hangers, and extension cords as well. 

 Dr. Kellogg identified 250 distinct injuries suffered by Davontae, including cigar or
cigarette burns and ligature marks on his arms and legs, many of which were old enough to
have formed scars. Dr. Konzelmann testified about a significant injury to Davontae's lip that
would have, before it healed, made it difficult for him to eat and nearly impossible to drink. 
Davontae also had a deformity to one of his ears that was caused by long-term traumatic
injury and ligature scarring on his penis caused by attempts to prevent Davontae from wetting
his bed.

 And as shown above, there was ample evidence of intentional starvation. Davontae
had been healthy and growing in 1999; his starvation was not based on metabolic factors. 
The presence of depleted fat cells showed that he had received adequate nutrition at some
time. Dr. Kellogg testified that there was no food matter in Davontae's system beyond his
stomach, indicating that he had not eaten regularly. The jury heard from Dr. Kellogg that
Davontae's death occurred over a number of months. 

 The jury also heard from Carol Bowdry, Coleman's own expert, that Davontae's
injuries were torturous. Bowdry agreed on cross-examination that Coleman systematically
and chronically abused Davontae. She testified that Davontae "went through agony." 
Bowdry also testified that abusers such as Coleman "may intend for the child to go through
an awful lot of pain and suffering," but are surprised when a child dies from the abuse. 
Coleman's second expert, Dr. Mary Connell, testified on cross-examination that even
someone like Coleman who suffered abuse as a child would know that the systematic abuse
of Davontae was wrong.

 The State presented evidence of Coleman's prior felony convictions for burglary of
a habitation and possession of a controlled substance. On cross-examination, defense expert
Dr. Paula Lundberg-Love admitted that Coleman had revealed to her a conviction for
unlawfully carrying a weapon when she was seventeen in 1993, an arrest for evading arrest
in 1995, and a parole violation in 1997 that resulted in her return to prison.

 A rational jury could determine from this evidence that, beyond a reasonable doubt,
there was a probability that appellant would commit criminal acts of violence in the future
so as to constitute a continuing threat to society. Point of error fifteen is overruled.

Mitigation Special Issue

 In point of error sixteen, Coleman argues that the evidence is insufficient to show an
absence of mitigation to support the jury's negative finding on the mitigation special issue. 
We have said, however, that we will not review the jury's finding regarding the mitigation
special issue for sufficiency of the evidence because the determination as to whether
mitigating evidence calls for a life sentence is left to the discretion of the jury. (53) Point of
error sixteen is overruled.Definitions

 In point of error eleven, Coleman alleges that the mitigation special issue was
unconstitutionally vague and indefinite in violation of the Fourteenth Amendment and the
Texas Constitution for failing to provide a definition of "mitigating evidence." In point of
error nineteen, Coleman alleges the trial judge deprived her of her rights to due process and
the protection against cruel and unusual punishment by rejecting her request that the jury be
instructed on the definitions of "criminal acts of violence" and "probability." We have
previously held that a trial judge need not define the terms used in the special issues because
the jury is presumed to understand them without instruction. (54) Points of error eleven and
nineteen are overruled.

Constitutionality of Death-Penalty Scheme In her fourteenth point of error, Coleman complains that the Texas death-penalty
scheme is unconstitutional because the State is not required to prove the absence of sufficient
mitigating circumstances beyond a reasonable doubt. We have addressed and rejected this
and similar arguments in the past. (55) Point of error fourteen is overruled.

 In point of error seventeen, Coleman complains that she was deprived of due process
under the Fifth, Eighth, and Fourteenth Amendments because the State has unfettered
discretion in seeking the death penalty. We have previously addressed and rejected this
complaint. (56) Point of error seventeen is overruled.

 In point of error eighteen, Coleman complains that she was deprived of her rights to
due process and the protection against cruel and unusual punishment because the jury was
instructed that at least ten "no" votes were required to return a negative answer to the
mitigation special issue. Coleman also complains that jurors were not instructed regarding
the consequences of their deliberations. We have previously addressed these issues and find
no reason to do so again. Point of error eighteen is overruled. (57) 

 In point of error twenty, Coleman challenges the constitutionality of Article 37.071
Section 2(b)(1) of the Texas Code of Criminal Procedure. Coleman argues that Article
37.071 diminishes the State's burden of proof because it allows the jury to answer the future-
dangerousness special issue "yes" based on a probability standard, rather than a beyond a
reasonable doubt standard. We have previously rejected this and similar arguments. (58) Point
of error twenty is overruled.

Execution Protocol

 In point of error twenty-one, Coleman alleges that the use of pancuronium bromide
in the chemical mixture used to execute prisoners in Texas violates the prohibition against
cruel and unusual punishment. Coleman's execution is not imminent. The method by which
the lethal injection is currently administered is not determinative of the way it will be
administered at the time of her execution. (59) Thus, her claim is not ripe for review. (60) Point
of error twenty-one is overruled.

Conclusion

 Based on the foregoing, we affirm the judgment of the trial court as to Count One. 
We also dismiss Coleman's claims challenging her conviction under Count Two. 


DELIVERED: December 9, 2009

DO NOT PUBLISH
1. Tex. Penal Code Ann. § 19.03(a)(2).
2. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(g).
3. Id. at § 2(h).
4. See Callins v. State, 726 S.W.2d 555, 558 (Tex. Crim. App. 1986) (holding that
appeals of non-capital convictions, even when obtained in the same trial as a murder
conviction in which the death penalty was assessed, are properly reviewed by the
intermediate court of appeals on direct appeal).
5. See Callins, 726 S.W.2d at 558.
6. Tex. R. App. P. 38.1(e), (h).
7. 443 U.S. 307, 319 (1979) (emphasis in original). 
8. Watson v. State, 204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006). 
9. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).
10. Tex. Penal Code Ann. § 20.03.
11. Tex. Penal Code Ann. § 20.01(2).
12. Brimage v. State, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1994).
13. Id. at 476.
14. Id.
15. Id. at 475.
16. Id. at 476.
17. Id.
18. Id. at 475.
19. See Turner v. State, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980).
20. See Tex. Penal Code Ann. § 20.01(1)(B)(i).
21. See Tex. Penal Code Ann. § 20.01(1)(A).
22. Fann v. State, 696 S.W.2d 575, 576 (Tex. Crim. App. 1986); Laster v. State,
275 S.W.3d 512, 522 (Tex. Crim. App. 2009).
23. Laster, 275 S.W.3d at 521 ("Secreting or holding another where he or she is
unlikely to be found is part of the mens rea requirement of the offense--not the actus
reus.") (citing Brimage v. State, 918 S.W.2d 466, 476 (Tex. Crim. App. 1994)).
24. See id. at 522. 
25. Tex. Penal Code Ann. § 19.03(a)(2). 
26. Russeau v. State, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); Rayford v.
State, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003).
27. U.S. Const. amend. V; Tex. Const. art. I, § 14.
28. Tex. Code Crim. Proc. Ann. art. 37.09(1).
29. Bigon v. State, 252 S.W.3d 360, 373 (Tex. Crim. App. 2008).
30. See Callins, 726 S.W.2d at 558.
31. 384 U.S. 436 (1966).
32. Wilkerson v. State, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). 
33. Id. at 528.
34. Id.
35. Id.
36. Id.
37. Id. at 529.
38. Id.
39. Id. at 530.
40. Id.
41. Id. at 531.
42. Marable v. State, 85 S.W.3d 287, 287-88 (Tex. Crim. App. 2002).
43. Dinkins v. State, 894 S.W.2d 330, 340 (Tex. Crim. App. 1995) (citing Holley v.
State, 766 S.W.2d 254, 256-57 (Tex. Crim. App. 1989); Inman v. State, 650 S.W.2d 417,
419 (Tex. Crim. App. 1983)).
44. See Dinkins, 894 S.W.2d at 339-40 (held that the application paragraph that
failed to allege the culpable mental state for the second murder was not erroneous because
the abstract portion of the charge defined murder, which included the culpable mental
state).
45. Tex. Penal Code. Ann. § 7.02(a)(2).
46. Feldman v. State, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); Wright v. State,
28 S.W.3d 526, 537 (Tex. Crim. App. 2000); see also Hankins v. State, 132 S.W.3d 380,
384 (Tex. Crim. App. 2004). 
47. Hankins, 132 S.W.3d at 385.
48. Id.
49. Id.
50. Id.
51. Wardrip v. State, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); see also Keeton
v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).
52. Ladd v. State, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).
53. Green v. State, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); Colella v. State,
915 S.W.2d 834, 895 (Tex. Crim. App. 1995).
54. Blue v. State, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); Martinez v.
State, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); Garcia v. State, 887 S.W.2d 846,
859 (Tex. Crim. App. 1994); Earhart v. State, 877 S.W.2d 759, 767 (Tex. Crim. App.
1994). 
55. Perry v. State, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); Blue, 125
S.W.3d at 500-01.
56. Perry, 158 S.W.3d at 446-47; Blue, 125 S.W.3d at 500-01.
57. Prystash v. State, 3 S.W.3d 522, 536 (1999); McFarland v. State, 928 S.W.2d
482, 519 (1996); Lawton v. State, 913 S.W.2d 542, 558-59 (1995).
58. Robison v. State, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994); see also
Rayford v. State, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003); Kemp v. State, 846
S.W.2d 289, 308-09 (Tex. Crim. App. 1992).
59. Gallo v. State, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007).
60. Id.